Jeffry NEWTON, American Library Association, American Booksellers Foundation for Free Expression, Association of American Publishers, Inc., American Society of Journalists and Authors, National Associations of College Stores, Joshua Dove, by his next friend and mother, Kathy Hensley, Erin Johnson, by her next friend and father, Bruce Johnson, Chris Dalrymple, by his next friend and mother, Mary Dalrymple, and Cecilia Heneberry, Plaintiffs,

v.

C. James SLYE, in his official capacity as Principal, Spotswood High School, John H. Kidd, in his official capacity as Superintendent, Rockingham County Schools, and Rockingham County School Board, Defendants.

No. CIV. A. 5:00CV00003.

United States District Court,
W.D. Virginia,
Harrisonburg Division.

May 2, 2000.

Rebecca K. Glenberg, ACLU of Virginia, Richmond, VA, Michael A. Bamberger, Sonnenschein, Nath & Rosenthal, New York, N.Y., Rodney Alan Smolla, T.C. Williams School of Law University of Richmond, Richmond, VA, for Jeffry Newton, American Library Association, American Booksellers Foundation for Free Expression, American Society of Journalists and Authors, Association of American Publishers, Inc., National Association of College Stores, Joshua Dove, Erin Johnson, Chris Dalrymple, Cecilia Heneberry, plaintiffs.

Douglas Leigh Guynn Wharton, Aldhizer & Weaver, PLC, Harrisonburg, VA, Mark Dudley Obenshain, Wharton, Aldhizer & Weaver, PLC, Harrisonburg, VA, G. Rodney Young, II, Wharton, Aldhizer & Weaver, Harrisonburg, VA, C. James Slye, John H. Kidd, Rockingham County School Board, defendant.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

Plaintiff Jeffry Newton, joined by publisher plaintiffs, American Library Association, American Booksellers Foundation for Free Expression, Association of American Publishers, Inc., American Society of Journalists and Authors, and National Associations of College Stores (the "Associations"), and student plaintiffs, Joshua Dove, Erin Johnson, Chris Dalrymple and Cecilia Heneberry (the "student plaintiffs"), filed suit against defendants James Slye, Principal of Spotswoood High School, and John H. Kidd, Superintendent of Rockingham County School, on January 12, 2000, invoking federal jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201 and 2202; 42 U.S.C. § 1983; and the First Amendment of the Constitution of the United States.[1] On April 10, 2000, the court heard arguments from counsel on plaintiff's motion for a preliminary injunction. Prior to the hearing date, the court had received the parties' memoranda and certain of the supporting affidavits. Having thoroughly considered the issue, the court finds that an injunction is inappropriate for this case, and thus, denies the plaintiffs' motion.

### I.

Plaintiff Newton is an English teacher at Spotswood High School ("SHS"). The Plaintiff Associations publish a list of banned or challenged books every year in celebration of Banned Books Week. The purpose of the pamphlets is to celebrate the freedom to read and to raise awareness about censorship. The 1997–98 version of the pamphlet has the slogan "Read a Banned Book" printed on the cover, and the 1998–99 version has the slogan "Free People Read Freely."[2] Since 1994, Newton has been posting the annual pamphlet on the outside of the door to his classroom, along with various other items, including cartoons, brochures, and articles of interest and value to high school students. In posting such items, Newton hopes and intends to educate, inform, entertain and provide "food for thought" for his own students as well as other students passing by the door.

In Fall 1998, Newton ordered reprints of the 1997–98 banned books pamphlets and posted one of them on the outside of his classroom door. As he had in years past, he purchased the pamphlets using a Rockingham County School Board purchase or-

---

**1.** 28 U.S.C. § 1331 grants original jurisdiction to federal district courts of actions arising under the Constitution and laws of the United States.

§ 2201 gives courts authority to create a remedy "upon the filing of an appropriate pleading" by declaring the rights of the parties seeking such a declaration.

§ 2202 authorizes courts to grant "further necessary or proper relief" based on a declaratory judgment.

42 U.S.C. § 1983 imposes civil liability on any person who under color of State law causes any citizen to be deprived of rights under the Constitution or laws and creates a private cause of action for the citizen whose rights are thus violated.

**2.** The titles on some of the listed books reflect patently sexual themes: *Woman on Top: How*

*Real Life Has Changed Women's Sexual Fantasies* and *The Joy of Gay Sex*. Others reflect mature themes: *Marijuana* and Marilyn Manson's *The Long Hard Road Out of Hell*. Some of the books themselves contain narrative accounts and graphic depictions of sex acts (homosexual and heterosexual), incest, animal torture, self mutilation, and others. But on the other hand, some of the books reflect classic literature, such as *Catcher in the Rye, Of Mice and Men, The Adventures of Huckleberry Finn, The Adventures of Tom Sawyer* and *Death of a Salesman*. Other books have been turned into major motion pictures, including *The Hunt for Red October, The Client, The Firm, The Pelican Brief,* and most recently, *Snow Falling on Cedars*.

der. The pamphlets, which not only listed various banned books, but included descriptions of the books and explained why such books were banned, hung on Mr. Newton's door for approximately a year without creating any disturbance.

Allegedly, on September 13, 1999, Newton received an e-mail message from a parent inquiring about the pamphlet. Over the course of the next week, Newton and the concerned parent exchanged several e-mail messages. In one message, the parent asked, "Just curious ... why would you want a child to read a book that contains objectionable material?" In his responses, Newton allegedly attempted to explain the purpose of the pamphlets and reassure her that he would never ask a child to read a book that the child or his parents found "objectionable." At least one of the e-mail responses sent by Newton was reviewed and approved in advance by Defendant Slye. In the meantime, Newton allegedly e-mailed several of his colleagues declaring that "I rather hope she [the parent] pushes the issue-I believe I can win this one." At some point during the course of the e-mail exchange, Newton ordered the 1998–99 Banned Books Week pamphlet. The pamphlet arrived shortly thereafter, and Newton posted it on his classroom door.

On September 22, 1999, Newton met briefly with Slye regarding the pamphlets. Defendant Slye informed him that one of the titles on the 1997–98 banned books list, *The Joy of Gay Sex*, was unacceptable. On September 29, 1999, Slye called Newton into his office for a meeting where he asked Newton the following questions and received the following responses:

Question 1: How do you use the pamphlet?

Response: I post it and use it to teach about censorship.

Question 2: Do you purchase books from the pamphlet for students?

Response: Yes, depending on the book.

Question 3: Would you help a student obtain a book from the pamphlet?

Response: Yes, depending on the book.

Question 4: If you helped a student get a book from the pamphlet, would you get parent permission first?

Response: No.

Defendants Slye and Kidd believed that the pamphlets carried messages potentially compromising the themes of its current curricular initiatives, Family Life Education, "Character Counts," the Code of Responsible Student Conduct, and the school's Substance Abuse Policy. Slye then directed Newton to remove the pamphlets from his door, but informed Newton that he could continue to hand out the pamphlets in the classroom setting where students could receive more guidance upon receiving such information. That evening, Newton wrote an e-mail to Slye asking him to put in writing what Newton must do, and the consequences for not doing it. On the following day, Slye delivered a letter to Newton. The letter explained that:

The posting or display on a teacher's classroom door is considered an extension of an approved curriculum and is supposed to be professionally consistent with and have a direct, positive connection to the particular approved curriculum. A teacher's door, or bulletin board or any other similar surfaces or wall, is not a billboard or a vehicle for the promotion of the reading of such books.... I direct you to remove the Banned Books pamphlets, which includes the new one for 1998–1999. They are not to be posted again. This directive is to be followed immediately upon receipt or I will have no alternative but to report you to the Superintendent for failure to follow a directive from the principal.

Interpreting this letter to mean that his employment would be terminated if he did not remove the banned books pamphlets, Newton did so. Since then, Slye has attempted to recommend ways that Newton may introduce the students to the pamphlets in a more supervised nature, such as having the students pen essays in refer-

ence to censored books. Moreover, the defendants have not prohibited any SHS students, including those students not enrolled in any of Newton's classes, from approaching Newton and requesting the information in the pamphlets. However, plaintiffs continue to seek the ability to post the banned books pamphlets on Newton's door.

In Count I (¶¶ 44–45) of the Complaint, the plaintiffs alleged the defendants violated their First Amendment rights by removing the banned books pamphlets from Newton's classroom door. In Count II (¶¶ 46–47), the plaintiffs alleged the defendants violated their state law rights under Article I, § 12 of the Virginia Constitution. Plaintiffs seek a declaratory judgment finding that their civil rights had been violated and a preliminary and permanent injunction requiring the defendants to allow Newton to post the banned books pamphlets on his classroom door, together with the plaintiffs costs and attorney's fees. Defendants answered the complaint on January 19, 2000, admitting some of the factual allegations in the complaint, but denying all counts and denying that the plaintiffs are entitled to any of the relief sought.

## II.

This court has recently emphasized, "[i]n dealing with any preliminary injunction request, the court is acutely aware of the potential for mischief in acting on such a request." *Schleifer v. City of Charlottesville*, 963 F.Supp. 534, 537 (W.D.Va.1997), aff'd, 159 F.3d 843 (4th Cir.1998). As the Fourth Circuit has expressed, "[g]ranting a preliminary injunction requires the district court, acting on an incomplete record, [to] order a party to act, or refrain from acting, in a certain way. '[T]he danger of a mistake' in this setting 'is substantial.'" *Hughes Network Sys. v. InterDigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir.1994) (quoting *American Hosp. Supply Corp. v. Hospital Prods., Ltd.*, 780 F.2d 589, 593 (7th Cir.1986)). "Where serious issues are before the court, it is a sound idea to maintain the status quo *ante litem.*

..." *Feller v. Brock*, 802 F.2d 722, 727 (4th Cir.1986) (citing *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir.1977)).

Preliminary injunctive relief requires a balancing of four factors: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Hoechst Diafoil Co. v. Nan Ya Plastics*, 174 F.3d 411, 417 (4th Cir.1999). The "[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir.1991).

### A. Irreparable Injury to Plaintiffs

The plaintiffs claim they will suffer irreparable injury if the preliminary injunction is not granted. They allege that both Newton and the Associations have been discriminated against on the basis of their viewpoint, and have been unable to communicate ideas about censorship to the school community at large by posting the pamphlets. Additionally, the student plaintiffs contend they have been denied free access to the pamphlets based on the ideas expressed in the pamphlets. The Supreme Court has determined that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). However, the *Elrod* case can be distinguished with the one presently before the court as several of the plaintiffs in that case were threatened with discharge or had agreed to provide support for the Democratic Party in order to avoid discharge. *See id.* In the present case, such harm has not been threatened. In fact, no one has been disciplined-or threatened with actual discipline. Neither adverse job action nor student punishment has taken place in this dispute.

*See Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir.2000) (citing cases finding no adverse impact on First Amendment rights when the employer's alleged acts were criticism, false accusations, reprimands, or failure to award merit pay increases).

Moreover, nothing has been banned, nor has any book or flyer been discarded. The pamphlets remain at SHS-in the classrooms. No parent, principal or superintendent blocks Newton nor any student from access to these items. Newton is permitted to make assignments regarding censorship, using the pamphlets in his classroom, with pedagogical guidance. Merely the distribution of the pamphlets has been altered to make it more educationally suitable to a high school setting. The student plaintiffs will be able to see the pamphlets located within Newton's and other teachers' classrooms; thus, they are not being deprived access to the information.[3] Further, to the extent that the Associations publish and market the pamphlets or books listed, they still will be able to do so. Though it is slightly more difficult for the Association plaintiffs to express their views regarding censorship through the pamphlets to the students at SHS, they are not being materially deprived this right. As such, the court does not find that the plaintiffs are likely to suffer irreparable harm if the preliminary injunction is denied.

*B. Harm to Defendants*

The harm the defendants may feel upon the granting of the injunction also must be considered. Newton has been posting the annual banned books pamphlets on his classroom door since 1994. During all of those years, the pamphlets have caused no disruption whatsoever in the school. Furthermore, one of the particular pamphlets that Newton was explicitly ordered to remove-the 1997–98 pamphlet-had already been on the door for about a year without any incident. There is no reason to believe that this pamphlet will constitute any more of a threat to the orderly management of the school than it has for the past year, or that the 1998–99 pamphlet will cause any problems in the school when previous pamphlets did not.

However, granting the preliminary injunction would in essence materially impair the defendants' authority to conduct the day-to-day affairs of the school. Such court action would undermine the defendants' judgment about the relative importance of aspects of their curricular programs and activities and the aims of pedagogical activities.[4] Injunctive relief would force the school to convey a message which defendants have determined to be at odds with the underlying content, and the community values, reflected in the curriculum and to counteract the school system's efforts at controlling the exposure of children to unsuitable matter.[5] Further, enjoining the defendants would permit a public school teacher to define the content of a school subject in whatever manner he chooses. Judge Luttig, in a concurring Fourth Circuit opinion, answers this contention quite forcibly:

> [T]he ultimate question for our resolution [is] whether a teacher has a constitutional right to define, at least in part, the school's curriculum, over the informed judgments of both school boards and parents.... [T]he court properly concludes that [a teacher] does not. Of

---

3. Particularly in this day and age where students having an interest in reviewing any of the titles of the books or even the books themselves not only may go to a bookstore, but also may view such lists through computers utilizing on-line ordering via Internet web sites of companies like Amazon.com.

4. This contention assumes that the posting of the pamphlets outside of Newton's classroom

is considered curriculum. This issue will be discussed more thoroughly *infra*.

5. For example, the School Board employs a division-wide software filtering system to provide protection against inappropriate student and staff exposure to the Internet. The program utilizes an algorithm to block offensive words, phrases, and offensive web sites.

course, were it otherwise-that is were every public school teacher in America to have the constitutional right to design (even in part) the content of his or her individual classes, ... the Nation's school boards would be without the most basic authority to implement a uniform curriculum and schools would become mere instruments for the advancement of the individual and collective social agenda of their teachers.

*Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 373 (4th Cir.1998) (Luttig, J., concurring). Thus, it appears the defendants' authority would suffer a harm even if the pamphlets themselves, while posted on Newton's classroom door, did not wreak havoc in the high school. Though this court views neither of these harms to be substantial, in balancing the harm the defendants may receive if the preliminary injunction is granted with the lack thereof that the plaintiffs would receive if the injunction is denied, this court finds that the balance of harm favors the defendants.

## C. Likelihood of Success on the Merits

The plaintiffs address several legal theories which they believe give them a basis for succeeding on the ultimate merits of the present case.

### 1. Speech Involving Public Concern

■ It is well-established that a teacher has a right to exercise free speech on matters of public concern under the First Amendment. *See Pickering v. Board of Educ. of Township High School*, 391 U.S. 563, 573, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The question of whether a public employee's speech is constitutionally protected turns upon the public or private nature of such speech. "Speech by a public school teacher is protected by the First Amendment when (1) the teacher speaks as citizen about matters of public concern and (2) the teacher's interest in exercising free speech is not outweighed by the countervailing interest of the state in providing the public service the teacher was hired to provide." *Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 156 (1992). When

the interests of the teacher, as citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs coincide, the court must balance the interests of each to determine which is to prevail. *See Pickering*, 391 U.S. at 568, 88 S.Ct. 1731.

The Supreme Court has distinguished between speech "as a citizen upon matters of public concern" and "as an employee upon matters only of personal interest." *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "The focus is [ ] upon whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a 'private' matter between employer and employee." *Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076, 1079–80 (4th Cir.1987) (quoting *Berger v. Battaglia*, 779 F.2d 992, 998–99 (4th Cir. 1985)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684.

Consistent with this interpretation, speech that courts have considered not a matter of public concern has for the most part involved employment disputes and internal office management. Such topics "do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee." *Stroman*, 981 F.2d at 156 (citing *Connick*, 461 U.S. at 147, 103 S.Ct. 1684). In merely considering content and form, the speech at issue here-the banned books pamphlets posted on the outside of a classroom door-does not appear to be related to conditions of employment or any other purely personal concerns. The subject matter of the pamphlets is nothing less than the freedom of speech guaranteed by the First Amendment to the United States Constitution.

By listing banned and challenged books and the reasons for and outcomes of the challenges, the pamphlets create a composite sketch of the implementation of constitutional values in schools and libraries. They stand as a warning that tolerance of censorship leads to the suppression of such works as *Death of a Salesman* and *Of Mice and Men.* They deal with a matter of important public policy, the regulation of books and ideas in the public schools.

■ However, when considering the context of the present speech with the content and form, this speech may dwindle down to an employment dispute which is outside the realm of public concern. The prohibition of students receiving such information contained in the pamphlets would be proper if this speech were determined to be part of the school curriculum. Public school officials have control of the curriculum of the school irrespective of teachers' First Amendment rights. Teachers may not claim constitutional rights in order to take control of the curriculum. *See Boring v. Buncombe County Bd. of Educ.,* 136 F.3d 364, 369 (4th Cir.1998). In *Boring,* the court found that a teacher's selection of a school play was curriculum related. Thus, it did not involve a matter of public concern, and therefore was not First Amendment protected speech. The Fourth Circuit acknowledged that "schools are typically not public forums" and unqualifiedly joined the Fifth Circuit in concluding that: "Although, the concept of academic freedom has been recognized in our jurisprudence, the doctrine has never conferred upon teachers the control of public school curricula." *Id.* at 369 (quoting *Kirkland v. Northside Indep. Sch. Dist.,* 890 F.2d 794, 800 (5th Cir.1989)). In light of *Boring,* the question in the present case turns in part on whether the postings on Newton's door were part of the curriculum at SHS.

The Fourth Circuit emphasized the broad definitional contours of "curriculum" outlined by the Supreme Court in *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), a case involving school newspaper student expression regulated by the principal. The court determined that the Supreme Court's definition of school curriculum was applicable to the case before them:

> The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public *might reasonably perceive to bear the imprimatur of the school.* These activities may fairly be characterized as part of the school curriculum, whether or not they occur in the traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skill to student participants and audiences.

*Boring,* 136 F.3d at 368 (citing *Hazelwood,* 484 U.S. at 271, 108 S.Ct. 562) (emphasis added).

■ In considering this definition, it is possible that the postings on the Newton's door may be considered curriculum, and thus, out of the realm of public concern. Though several items on Newton's, and other teachers', doors did not directly relate to their classroom studies, the purpose of posting various items was to inform and educate the students. Newton himself declared that by posting the pamphlets he hopes and intends to educate, inform, entertain and provide "food for thought" for his own students as well as other students passing by the door. Newton was responsible for posting the pamphlets. Further, if a student, curious about a book on the list, speaks with Newton regarding the book and desires to read it, Newton has stated that he would in fact purchase the book for the student without getting parental permission. In fact, in a Supplemental Declaration to this court, Newton stated that several of the books, selected by appropriateness of the content, presently are made available to the students in his classroom. Thus, the court can hardly conclude that Newton did not supervise

the students reading the pamphlets. Moreover, parents or other members of the public walking down school hallways may view the posted items on the doorways as something the school itself has approved or endorsed. For the foregoing reasons, the definition of curriculum in *Hazelwood* would encompass the posting of these items outside this door.

Further, Principal Slye's letter to Newton informing him that he must take down the banned books pamphlets evidences that the school considered the posting of this material on doors to be an extension of the curriculum. Taking all things into account, it is more likely that the posting of the pamphlets on any of the teachers' doors at SHS would be considered curriculum. Because First Amendment protection depends on whether the posting of the pamphlets was a matter of public concern or of curriculum, it would be improper for the court at this time to conclude that the plaintiffs would more likely than not succeed on the merits of this case. Accordingly, a preliminary injunction is improper.

■ Even if the speech were considered non-curricula, and thus, a matter of public concern, the court still may refrain from granting the preliminary injunction. The school may prohibit speech which is a matter of public concern if it can show a "countervailing interest of the state in providing the public service the teacher was hired to provide." *Stroman*, 981 F.2d at 156. The state bears the burden of justifying the prohibition of speech on legitimate grounds. *See Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. The degree of the school's burden "varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150, 103 S.Ct. 1684. For example, in *Connick*, in which only a small portion of the employee's speech touched a matter of public concern, and the content of the speech implicated working relationships in the office, the court afforded "a wide degree of deference" to the employer's judgment. *See id.* at 151–52, 103 S.Ct. 1684.

Typically, the type of harm considered sufficient to burden employee speech has involved disruptions to the work environment. Thus, courts have considered "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891 (citing *Pickering*, 391 U.S. at 570–73, 88 S.Ct. 1731). In this case, the statement impedes on the school district's ability to teach the selected curriculum based on community values that previously has been approved by the school board. The school board has taken steps to control the exposure of children to unsuitable matter as illustrated by the school's utilization of a division-wide software filtering system to provide protection against inappropriate student and staff exposure to the Internet. The school engages in such curricular programs as Family Life Education, Character Counts, the Code of Responsible Student Conduct and a Substance Abuse Policy. These programs run contrary to permitting a teacher to post a pamphlet of banned books, several of which contain topics at odds with the school's programs, without the insurance that the students are receiving the message that the pamphlet is speaking to censorship and not encouraging students to read one of the books on the list. While there existed no need in *Boring* necessarily to undertake a balancing test to weigh the teacher's interest against the school's stake in promoting its education mission, the Fourth Circuit left its views unmistakable. The school defendants had a pedagogical stake in the principal's decision to edit the otherwise objectionable play:

> While we are of opinion that Plaintiff [teacher] had no First Amendment right to insist on the makeup of the curriculum, even assuming that she did have, we are of opinion that the school admin-

istration did have such a legitimate pedagogical interest and the holding of the district court was correct. *Boring,* 136 F.3d at 370. As it is within the power of the school board to determine what shall be taught and how it shall be taught, *see Boring,* 136 F.3d at 370 (quoting *Sweezy v. New Hampshire,* 354 U.S. 234, 255, 263–64, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957)), when speech by a teacher runs contrary to the curriculum the school board is trying to teach, a legitimate reason exists for requesting a teacher to distribute the pamphlets in a more supervised way.

### 2. Viewpoint Discrimination

■ The plaintiffs assert that censorship based on viewpoint is prohibited by the First Amendment. "When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). An example of viewpoint discrimination would be a school district permitting its property to be used for the presentation of all views about family issues and child-rearing, except those dealing with the subject matter from a religious standpoint. *See id.* at 830, 115 S.Ct. 2510. The Court went on to state that "discrimination against one set of views or ideas is but a subset or particular instance of the more general phenomenon of content discrimination." *Id.* at 830–31, 115 S.Ct. 2510.

The plaintiffs allege that this case falls into this category because the defendants ordered the pamphlets removed on the basis of their content. Indeed, Mr. Slye's directive stated very clearly that the reason for prohibiting the 1997–98 pamphlet was that the pamphlet included certain titles dealing with sexuality that were inconsistent with the school's curriculum. The defendants assert that the method and manner of presenting the pamphlets utilized by Newton exposes students to concepts and graphic materials on subjects including incest, violence, self mutilation, animal torture, family violence, drug abuse and homosexual acts, without active pedagogical oversight, guidance or supervision. In the view of school administrators, this manner of introduction to these sensitive subjects is educationally intrusive and tends to undercut the curricular themes of programs such as Family Life Education and Character Counts.

The plaintiffs attempt to bring this claim into the realm of viewpoint discrimination by asserting that the defendants discriminated against the viewpoints expressed in the books listed in the pamphlets. To support this assertion the plaintiffs recite various statements of Slye; for example, "This is not a list of books that I want my kids to read," and "Our kids are not going to read books like these because our kids are normal." However, as asserted by the plaintiffs throughout this case, the purpose of the pamphlets was to inform the students about censorship and portray the idea that censorship is detrimental to society by depriving it of great works. Accordingly, that purpose should be the viewpoint the First Amendment protects, not the content of the materials listed in the pamphlets. As such, it cannot be said that the defendants discriminated against this viewpoint as the message of censorship was not the reason the defendants requested Newton to remove the pamphlets. The motivation of the defendants was not to stifle the viewpoint that censorship was a harm to society. In fact, Slye encouraged Newton to continue using the pamphlets in his classroom and to continue to hand them out to interested students who came to him seeking the pamphlets. For these reasons, the plaintiffs would not be likely to succeed on this claim.

## 3. *Public Forum*

■ The plaintiffs also assert that the school created a public forum open to a particular class of people-teachers-in permitting the teachers to post items on their doors.[6] "So-called 'designated public fora' (often called 'limited public fora') are those properties which the government has opened for expressive activity to the public, or to some segment of the public. A designated public forum can be opened only to a limited class of speakers or for limited topics." *Warren v. Fairfax County,* 196 F.3d 186, 193 (4th Cir.1999). The plaintiffs contend the defendants maintained a longstanding practice of allowing teachers to use their doors to display various items of interest for the entertainment or enlightenment of students, teachers, or others in the school community. As such, the plaintiffs argue that the government may not exclude a speaker who is within the class unless the exclusion is necessary to serve a compelling state interest. *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

The fact that Slye requested the removal of the pamphlets is consistent with the definition of a designated public forum. The principal limited who could post items on their doorways-teachers- and further limited what topics could be posted-topics consistent with the approved curriculum and appropriate for students of SHS. It would be ludicrous to insistent that teachers could post anything they want on their doorways. If this were the case, the school hallways could potentially be filled with pornography, guides to getting away with the perfect murder, instructions on how to build a bomb, etc. To prevent such a situation, there has to be some restrictions on what can be posted on the doorways. As it is appropriate to limit topics in designated public forums, it does not appear that the plaintiff is likely to succeed on this claim.

## D. *Public Interest*

The last factor a court should consider when determining whether to grant a preliminary injunction is whether there is a public interest in the alleged protected speech. The United States Supreme Court has recognized that matters of education are entrusted to the state and to local school boards. *See, e.g., Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). These educational authorities have every right to implement their curriculum in the way that best transmits and safeguards community values for young, impressionable students. These decisions are reached, and are reviewable, through the democratic process, which allows the citizens of Rockingham County, ultimately using the most democratic means of direct election, to influence and control the teachings that their children will receive. The Supreme Court has cautioned:

> It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion ... § 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

*Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The value-based decisions regarding the curriculum of a school require and deserve a democratic sense of the community. Thus, though the public certainly has an interest in determining what type of education students are receiving, they may voice, if unsatisfied, their concerns through the school board.

## III.

It is important to note that the conclusions set forth herein are made on an incomplete record. As such, a full evidentiary basis may change entirely the view of

---

**6.** The defendants, however, are of the position that the school environment, including the doorways, is not considered a public forum. *See Boring,* 136 F.3d at 369.

the court as to any of these issues. However, as it currently stands, the court does not find that the plaintiffs are likely to succeed on the merits of their claim. Additionally, because the students continue to have access to the pamphlets, the denial of a preliminary injunction at this time will not irreparably harm the plaintiffs. For the foregoing reasons, this court denies the plaintiffs' motion for a preliminary injunction.

An appropriate order this day shall issue.

### ORDER

Upon consideration of the plaintiffs' February 22, 2000 "Motion for Preliminary Injunction," it is hereby

ADJUDGED AND ORDERED

that the motion is DENIED for the reasons stated in the accompanying Memorandum Opinion.

The Clerk of the Court hereby is directed to send a certified copy of this Order to all counsel of record.