**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1796

SOUTH CAROLINA COASTAL CONSERVATION LEAGUE,

Plaintiff - Appellant,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, Charleston District; SA JOHN M. MCHUGH, in his official capacity as the Secretary of the US Army; LTG THOMAS P. BOSTICK, in his official capacity as Chief of Engineers; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; GINA MCCARTHY, in her official capacity as Administrator of the U.S. Environmental Protection Agency; HEATHER MCTEER TONEY, in her official capacity as Regional Administrator, Region IV, U.S. Environmental Protection Agency; SOUTH COAST MITIGATION GROUP LLC; LTC JOHN T. LITZ, in his official capacity as Commander of the Charleston District,

Defendants - Appellees.

Appeal from the United States District Court for the District of South Carolina, at Charleston. Richard Mark Gergel, District Judge. (2:13-cv-01543-RMG)

Argued: May 13, 2015     Decided: June 17, 2015

Before GREGORY and HARRIS, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge Hamilton wrote the opinion in which Judge Gregory and Judge Harris joined.

**ARGUED:** Catherine Moore Wannamaker, SOUTHERN ENVIRONMENTAL LAW CENTER, Atlanta, Georgia, for Appellant. Robert Lundman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Stanley E. Barnett, SMITH, BUNDY, BYBEE & BARNETT, P.C., Mount Pleasant, South Carolina, for Appellees. **ON BRIEF:** Christopher K. DeScherer, Heather A. Murray, SOUTHERN ENVIRONMENTAL LAW CENTER, Charleston, South Carolina, for Appellant. John C. Cruden, Assistant Attorney General, Aaron P. Avila, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Ellison P. Smith, IV, SMITH, BUNDY, BYBEE & BARNETT, P.C., Mount Pleasant, South Carolina, for Appellee South Coast Mitigation Group, LLC.

---

HAMILTON, Senior Circuit Judge:

South Carolina Coastal Conservation League (the League) is the plaintiff/appellant in this case. The League, headquartered in Charleston, South Carolina, is a non-profit corporation founded in 1989 under South Carolina law. It currently has approximately 5,000 members. The League's self-described "mission is to protect the natural environment of the South Carolina coastal plain and to enhance the quality of life of South Carolina communities by working with individuals, businesses, and government to ensure balanced solutions to environmental problems." (J.A. 36).

Generally speaking, the League brought the present action against various parties under federal law to stop what it fears will be significant degradation to 485 acres of freshwater wetlands and its conversion to saltwater wetlands. Having lost below on the ground of mootness, the League now appeals. The League also appeals the district court's denial of its motion to amend its First Amended Complaint to add one additional claim. We affirm.

I

This case involves a dispute over the use of 485 acres of an almost 700-acre tract of privately owned real property in Jasper County, South Carolina. The entire tract is adjacent to

3

two tributaries of the Back River fork of the Savannah River and the Back River's marsh system. The tributaries are Murray Hill Canal and Shubra Canal. The tract is also adjacent to the west side of a stretch of U.S. Highway 17, located approximately two miles north of Savannah, Georgia.

Since 2009, the entire tract has been owned by South Coast Mitigation Group, LLC (South Coast). Of the approximately 700 acres, thirty-percent is tidal salt marsh subject to the ebb and flow of the tide,[1] while the remaining seventy-percent (i.e., 485 acres) is separated from the Back River and its marsh system by man-made earthen embankments first built more than 150 years ago in order to create rice fields (the Embanked Tract). The rice fields have not been operated for the past eighty years.

The earthen embankments on the Embanked Tract include a variety of water control structures which can be opened in order to directly connect the Embanked Tract with the Back River and its tidal marsh system. When the water control structures are open, brackish water from the Back River and its tidal marsh system enters the Embanked Tract. South Coast possesses the sole legal right to operate these water control structures and

---

[1] The Back River is brackish due to its proximity to the Atlantic Ocean and to the Army Corps of Engineers' (the Corps) dredging of the Savannah River's channel to maintain navigability.

4

is entitled to do so without any government oversight. Accordingly, South Coast controls when brackish water from the Back River and its tidal marsh system enters the Embanked Tract.

Since the 1950s, the Embanked Tract has been managed for recreational activities such as hunting and fishing. The habitat within the Embanked Tract "includes an open water pond, a flooded field, mowed fields, forested wetlands, shrub/scrub wetlands, and forested uplands." (J.A. 63). For approximately the last thirty years, freshwater from a canal system constructed by the Corps further up the Savannah River has been available to the owner of the Embanked Tract to flood the impoundments thereon. Prior to 2011, freshwater was obtained from this canal system to flood the impoundments on the Embanked Tract allowing for the existence of freshwater wetlands thereon. However, since 2011, South Coast has chosen not to obtain water from this freshwater canal to flood any impoundments on the Embanked Tract. Rather, in 2011, 2012, and 2013, South Coast drained the impoundments from February to October, then reflooded them in October and November of those respective years with brackish water from the Back River and its tidal marsh system by opening the water control structures linking the impoundments to those areas.

The present litigation stems from South Coast's desire to connect the Embanked Tract with the Back River fork of the

5

Savannah River and its tidal marsh system to allow the entire almost 700-acre tract it owns to become a functioning tidal marsh integrated with the Savannah River. South Coast also desires to dedicate the site to use as a commercial tidal wetlands mitigation bank.[2]

To allow full integration of the Embanked Tract and the Savannah River, South Coast desires to remove all of the material used to create the earthen embankments currently separating the Embanked Tract from the Savannah River and to deposit such material in the adjacent ditches. This process would restore the natural elevation of the area.

Of relevance here, the Clean Water Act (CWA), 33 U.S.C. §§ 1251 through 1387, authorizes the Corps, with oversight by

---

[2] Federal guidelines define wetlands mitigation banking as:

> [W]etland restoration, creation, enhancement, and in exceptional circumstances, preservation undertaken expressly for the purpose of compensating for unavoidable wetland losses in advance of development actions, when such compensation cannot be achieved at the development site or would not be as environmentally beneficial. It typically involves the consolidation of small, fragmented wetland mitigation projects into one large contiguous site. Units of restored, created, enhanced or preserved wetlands are expressed as "credits" which may subsequently be withdrawn to offset "debits" incurred at a project development site.

Federal Guidance for the Establishment, Use and Operation of Mitigation Banks, 60 Fed. Reg. 58,605-02, 58,606 (Nov. 28, 1995).

the United States Environmental Protection Agency (EPA), id. § 1344(c), to issue permits for the discharge of fill material into the waters of the United States, id. § 1344(a). In June 2012, South Coast applied to the Corps for verification that deposit of the material used to create the earthen embankments currently separating the Embanked Tract from the Savannah River into the adjacent ditches meets the requirements of Nationwide Permit 27.[3] Nationwide Permit 27 allows for, among other things, activities in waters of the United States associated with the restoration, enhancement, and establishment of tidal and non-tidal wetlands and riparian areas, including those associated with the removal of embankments. Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,275 (Feb. 21, 2012). South Coast's proposal would impact 0.65 acres of ditches and 0.65 acres of embankments.

South Coast also sought the Corps' approval of a commercial mitigation banking instrument which would govern the proposed mitigation bank known as the Clydesdale Mitigation Bank. The Final Clydesdale Mitigation Banking Instrument defines the scope of the Clydesdale Mitigation Bank and specifies how the tidal

---

[3] Removal of such material by itself does not require a permit if done without discharging material into the waters of the United States.

marsh to be created would be protected and preserved from development.

Pursuant to the CWA and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 through 4370h, the Corps prepared an environmental assessment of the project and analyzed the Final Clydesdale Mitigation Banking Instrument. 33 U.S.C. § 1344(b)(1); 42 U.S.C. § 4332(2)(C). The Corps described the impoundments and surrounding area, analyzed the potential environmental impacts of the Final Clydesdale Mitigation Banking Instrument, and assessed potential alternatives. See 40 C.F.R. § 1501.4 (setting forth requirements of an environmental assessment). The Corps concluded that approval of such instrument did not require preparation of an environmental impact statement and issued a finding of no significant impact.

The Corps analyzed Nationwide Permit 27's applicability to South Coast's proposed action to impact 0.65 acres of waters of the United States. The Corps determined that placement of the excavated material from the embankments into the adjacent ditches would "restore natural elevations" and "not result in a loss of waters of the [United States]." (J.A. 123). The Corps then both verified that Nationwide Permit 27 applied to the removal of the embankments and the deposit of such material into the adjacent ditches and approved the Final Clydesdale

8

Mitigation Banking Instrument in April 2013 (the Approved Project).

Of relevance on appeal, on August 16, 2013, the League filed its First Amended Complaint against the Corps, certain Corps officials in their official capacities, the EPA, certain EPA officials in their official capacities, and South Coast (collectively Defendants). According to the First Amended Complaint, "[t]he League represents the interests of members who live or recreate in the immediate and general vicinity of the proposed project, and have an ongoing interest in protecting water quality and conserving wildlife and wildlife habitat in the areas impacted by the project." (J.A. 36-37). In the League's view, unless the Approved Project is stopped, saline water from the Savannah River, its tributaries, and its tidal marshland will intrude onto the Embanked Tract and cause the conversion of the freshwater wetlands thereon to saltwater wetlands, thus impairing its members' use and enjoyment of the Lower Savannah River ecosystem.

The First Amended Complaint alleges six counts. At this point, we set forth only the portions of those six counts at issue on appeal. Proceeding under the Administrative Procedure Act (the APA), 5 U.S.C. §§ 701 through 706, in Count 1, the League alleges the Corps and the EPA acted arbitrarily and

9

capriciously in approving the Final Clydesdale Mitigation Banking Instrument. Id. § 706(2).

In Counts 2 and 3, the League invokes the CWA's citizen suit provision, 33 U.S.C. § 1365(a), to challenge the Corps' and the EPA's actions in granting South Coast authorization, pursuant to Nationwide Permit 27, to fill in the ditches on the Embanked Track with the material removed from the adjacent embankments. The gist of the League's grievance in Count 2 is that the permitted activity does not constitute restoration of saltwater wetlands within the meaning of Nationwide Permit 27, but rather constitutes an unlawful conversion of freshwater wetlands to saltwater wetlands. The gist of the League's grievance in Count 3 is that granting South Coast approval to fill in the ditches on the Embanked Tract with the material removed from the adjacent embankments violates applicable regulatory guidelines.

Invoking the APA, in Count 4, the League alleges the Corps violated NEPA and its implementing regulations by failing to prepare an environmental impact statement prior to approving the Final Clydesdale Mitigation Banking Instrument. Relatedly, in Count 5, the League invokes the APA to challenge as conclusory, unsupported, arbitrary, capricious, and an abuse of discretion in violation of NEPA, the Corps' no-significant-impact finding

in the Corps' approval of the Final Clydesdale Mitigation Banking Instrument.

Finally, in Count 6, the League alleges the Corps violated the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 through 1544, by approving the Final Clydesdale Mitigation Banking Instrument and authorizing associated work to proceed under Nationwide Permit 27 without formally consulting with the National Marine Fisheries Service or the United States Fish and Wildlife Service regarding the impact of the Approved Project on endangered manatees, sturgeon, and wood storks. Id. § 1536(a)(2).

With respect to relief, the First Amended Complaint seeks: (1) various declarations to the effect that the Corps'/EPA's verification that placement of the embankment material into the adjacent ditches meets the requirements of Nationwide Permit 27 and that the Corps'/EPA's approval of the Final Clydesdale Mitigation Banking Instrument violates the CWA, the APA, NEPA, and the ESA; (2) vacature of the verification under Nationwide Permit 27 and the approval of the Final Clydesdale Mitigation Banking Instrument; (3) an injunction enjoining all defendants from authorizing any action or construction associated with the Nationwide Permit 27 verification and the approval of the Final Clydesdale Mitigation Banking Instrument; and (4) costs, including reasonable attorneys' fees and expert witness fees.

11

On October 24, 2013, South Coast moved to dismiss the entire action as moot because, as owner of the property, it had the authority to flood the impoundments on the Embanked Tract with brackish water anytime it so chose. The district court found this argument unpersuasive, stating:

> The Court disagrees and finds this case is not moot. South Coast does not allege that it has in fact allowed saltwater intrusion or that the facts or circumstances underlying this case have changed. Rather, it asserts that they might hypothetically change in the future. Unless circumstances in fact change, the Court finds that it can provide an effective remedy to Plaintiff by vacating the approval of the proposed project under [Nationwide Permit] 27 and approval of the [Final Clydesdale Mitigation Banking Instrument].

(J.A. 300-01).

South Coast subsequently conducted tests between January 27, 2014 and February 14, 2014 regarding the salinity of the water inside the impoundments on the Embanked Tract and the salinity of the water immediately outside the Embanked Tract in the Back River and its marshland system. The tests reflected the average salinity of the water inside the Embanked Tract at 3.4 parts per thousand and the average salinity of the water immediately outside the Embanked Tract at 2.8 parts per thousand.

On March 14, 2014, the League sought leave to amend its First Amended Complaint to include a claim that the Corps, in approving the Final Clydesdale Mitigation Banking Instrument,

12

failed to adequately consider a proposed new mitigation bank known as the Murray Hill Mitigation Bank as part of the cumulative impact analysis required by NEPA. Armed with the newly obtained salinity readings, shortly thereafter, South Coast moved to dismiss the entire action as moot, or in the alternative, for summary judgment on the ground that the water which the League seeks to keep out of the impoundments on the Embanked Tract is actually less saline than the water within the impoundments on the Embanked Tract. According to South Coast, the League's primary feared harm (i.e., the conversion of freshwater wetlands to saltwater wetlands) had already occurred.

After being granted time to conduct its own salinity testing of the waters inside and outside the Embanked Tract, the League did not contest the accuracy of South Coast's test results. However, the League did contest South Coast's factual assertion that the freshwater wetlands inside the Embanked Tract had already been fully converted to saltwater wetlands. According to the League, the freshwater wetlands inside the Embanked Tract had not yet fully converted to saltwater wetlands.

In support of its position, the League submitted the affidavits of three wetlands experts—Dr. Daniel Tufford, Dr. Richard Porcher, and Robert Perry. At this point, we quote the critical excerpts of each expert's affidavit.

13

Dr. Daniel Tufford, Ph.D in environmental health sciences from the University of South Carolina, opined:

> In my experience, one would need a salinity of approximately 20 ppt or higher to create a salt marsh. As indicated by South Coast's own monitoring, the salinity readings of waters inside and immediately outside the impoundments revealed an average salinity of 3.4 ppt. This level of salinity is far short of what would be required to either create salt marshes (or even brackish marshes) or to irreversibly convert the freshwater wetlands into salt marshes. This conclusion is further supported by our recent site visit, where it was clear that much of the site was still dominated by freshwater wetland plants. Moreover, with access to freshwater from the federal diversion canal, there is no doubt that these impoundments can continue to be maintained as freshwater wetlands.

(J.A. 404).

Dr. Richard Porcher, Jr., Ph.D. in biology from the University of South Carolina, opined:

> Based on [my] May 12, 2014 site visit, I see no reason why all of the impounded areas on the Clydesdale tract on the Savannah River cannot be returned or restored to their natural freshwater nature given the right of South Coast to demand freshwater from the federal diversion canal. I believe South Coast's contentions that these impounded areas no longer resemble freshwater wetlands or can no longer be managed as freshwater wetlands are wrong in a number of respects.
>
> *   *   *
>
> . . . Given the vegetation I observed, all three impounded areas will respond to flooding by freshwater and can be managed as freshwater wetlands.
>
> *   *   *
>
> . . . [I]t is my understanding that South Coast has the right to demand freshwater from the U.S. Fish &

14

Wildlife Service via the federal diversion canal. With access to a supply of freshwater, there is no doubt in my mind that the impounded areas on the site proposed for the Clydesdale Club Mitigation Bank can still be managed as a freshwater wetland resource.

(J.A. 413-14).

Robert D. Perry, Masters Degree in wildlife biology from Clemson University and the Director of Environmental Programs for the South Carolina Department of Natural Resources, opined:

It will take many years of flooding at low salinities, . . . along with drought, to cause any change in the plant community of the [Embanked Tract]. Even so, the effects of flooding for several years with low salinity would be minor and could easily be reversed with one or two years of flooding with freshwater. Normal rainfall captured inside the [Embanked Tract] will negate the effect on the plant community of low salinity in the ditches of the Project.

\* \* \*

. . . Based on my many years of field experience, research, and management of tidal wetlands in all salinity regimes, and based on my familiarity with the [Embanked Tract], I conclude that the marshes within the [Embanked Tract] indeed have been and continue to be freshwater marshes. They can be managed in the future with fresh or low-salinity tidal water introduced through existing water control structures, the capture of rainfall or by the [Corps'] freshwater canal system. There is no evidence of vegetation indicative of flooding with brackish water for any prolonged period. The presence of plants that can thrive in both freshwater and low-salinity water does not constitute conversion to a "brackish marsh." Any opinion that the marshes of the [Embanked Tract] "are no longer fresh water impoundments in any sense of the term" cannot be supported by observable evidence and available science.

(J.A. 424-25).

15

On the record before it, the district court agreed with South Coast's argument that the case was moot and dismissed the case on July 11, 2014, reasoning as follows:

> Here, the harm sought to be enjoined—preventing the intrusion of brackish water into the freshwater impoundments—has already occurred. In fact, the water inside the impoundments is more saline than the water Plaintiff seeks to prevent from entering the impoundments. The Court finds that under these circumstances it cannot provide meaningful relief and that this case is therefore moot.

(J.A. 488). The district court further denied the League's motion to amend the First Amended Complaint as futile because the proposed amendment would not alter the nature of the case. This timely appeal followed.

II

On appeal, the League contends this action is not moot, and therefore, the League seeks vacature of the district court's July 11, 2014 order and a remand for further proceedings. The League's contention is without merit.

Federal courts are limited to resolving cases and controversies, U.S. Const. art. III, § 2, and a case or controversy does not exist unless the plaintiff possesses standing to challenge the defendant's alleged misconduct. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). To satisfy Article III's standing requirement, "[t]he plaintiff must have

16

suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1386 (2014) (quoting Lujan, 504 U.S. at 560).

When a case or controversy ceases to exist, the litigation is moot, and the court's subject matter jurisdiction ceases to exist also. Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983) (per curiam). A case can become moot due either to a change in the facts or a change in the law. Ross v. Reed, 719 F.2d 689, 693–94 (4th Cir. 1983). We review the district court's mootness determination de novo. See Simmons v. United Mortg. & Loan Inv., LLC, 634 F.3d 754, 762 (4th Cir. 2011). Moreover, "[w]e review a district court's jurisdictional findings of fact on any issues that are not intertwined with the facts central to the merits of the plaintiff's claims under the clearly erroneous standard of review . . . ." U.S. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 348 (4th Cir. 2009).

Here, the district court concluded the League's claims had become moot due to a change in the facts. Specifically, the court concluded that, because the water inside the impoundments in the Embanked Tract is now more saline than the water the League seeks to prevent from entering the impoundments in the

17

Embanked Tract, the court cannot provide meaningful relief with respect to the League's feared harm of the wetlands on the Embanked Tract turning from freshwater wetlands to saltwater wetlands.

Although given sufficient opportunity to present evidence challenging the salinity readings relied upon by the district court in making its mootness determination, the League did not do so. Instead, the League attacks the district court's mootness determination on the ground that in making such determination the district court ignored the declarations of its experts explaining that the salinities measured by South Coast are not nearly high enough to work a conversion of the impoundments on the Embanked Tract from freshwater wetlands to saltwater wetlands and the current salinity readings could be reversed by obtaining freshwater from the freshwater canal operated by the Corps. By ignoring this evidence, the League asserts, the district court erroneously construed the facts in the light most favorable to South Coast instead of construing the facts in the light most favorable to the League as the party opposing summary judgment. See Young v. United States Parcel Serv., Inc., 135 S. Ct. 1338, 1347 (2015) (on summary judgment, the district court must view the evidence in the light most favorable to the nonmoving party). Such error, the League argues, caused the district court to accept South Coast's

18

assertion that a conversion of freshwater wetlands to saltwater wetlands had already occurred inside the impoundments in the Embanked Tract.

The obvious problem with the League's position is that whether a full conversion of the once completely freshwater wetlands within the Embanked Tract to saltwater wetlands has occurred or not is irrelevant to the mootness analysis given that allowing South Coast to level the embankments and place the fill dirt in the adjacent ditches will not make the water within the Embanked Tract any more saline than it currently is. Indeed, the League concedes in its Reply Brief that vacating the Corps' decision allowing South Coast to fill the ditches on the Embanked Tract with material from the embankments pursuant to Nationwide Permit 27 and vacating the Corps' approval of the Final Clydesdale Mitigation Banking Instrument "may not reduce the salinity of the water that regularly is introduced into the impoundments . . . ." Appellant's Reply Br. at 5 (internal quotation marks and citation omitted). Under these undisputed circumstances, the nonredressability of the League's alleged harm via success on any of its claims in the present litigation is plain. The record on appeal does not support the proposition that granting the League the relief it seeks on any of its claims will likely prevent the water within the Embanked Tract from becoming more saline. Moreover, South Coast is under no

19

legal obligation to obtain fresh water from the fresh water canal operated by the Corps and has not done so for at least the last four years.

The League tries to sidestep the pellucidity of the above lack-of-redressability analysis by arguing that even if a full conversion has occurred, the district "[c]ourt could still—at a bare minimum—award [it] meaningful relief on its claims that the Corps' . . . approval [of the Final Clydesdale Mitigation Banking Instrument] is arbitrary and capricious, which would prevent the development of a mitigation bank at the site." Appellant's Reply Br. at 6. The League's argument is circular because it misses the point that for the League to have Article III standing to challenge the Corps' approval of the Final Mitigation Banking Instrument, its members must have suffered or be imminently threatened with suffering a concrete and particularized injury in fact that is fairly traceable to the Corps' approval of the Final Mitigation Banking Instrument and is likely to be redressed by a favorable judicial decision. Lexmark Int'l, Inc., 134 S. Ct. at 1386. Try as it might, the League has not identified any such concrete and particularized injury in fact. The League's disagreement with the wisdom of the Corps' challenged approvals in this case and the League's general belief that saltwater mitigation banks are a bad idea for the environment is insufficient to establish

jurisdictional standing to continue the current litigation. <u>Diamond v. Charles</u>, 476 U.S. 54, 62 (1986) ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements.").

For the reasons stated, we affirm the district court's dismissal of this action as moot.


III

We next turn to the League's challenge to the district court's denial of its motion for leave to amend its First Amended Complaint to add a claim that the Corps failed to consider the cumulative impact of permitting another salt marsh mitigation bank at adjacent property as required by NEPA regulation 40 C.F.R. § 1508.7. According to the League, because the district court's mootness ruling is in error, the district court should have granted it leave to amend. Notably, the League offered no additional basis for standing with respect to the claim it sought to add.

This issue need not detain us long. Because the district court's mootness ruling is sound and the League has offered no additional basis for standing, the district court did not abuse its discretion in denying, on the ground of futility, the

21

League's motion seeking leave to amend its First Amended Complaint.

IV

In conclusion, we affirm the district court's July 11, 2014 order dismissing this action as moot and affirm the district court's denial of the League's motion seeking leave to amend its First Amended Complaint.

AFFIRMED

22