John W. STROMAN, Plaintiff–Appellant,

v.

COLLETON COUNTY SCHOOL DISTRICT; A.L. Smoak, Jr., Superintendent of Education, Colleton County School District; Colleton County Board of School Trustees; Nathel H. Kennedy, Chairman, Colleton County Board of School Trustees, Defendants–Appellees.

No. 92–1340.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 2, 1992.

Decided Dec. 4, 1992.

As Amended Jan. 26, 1993.

David Brian Goodhand, Appellate Litigation Clinical Program, Georgetown University Law Center, Washington, D.C., argued (Athena S. Lai, Mara J. Lozier, and William J. Nelson, Student Counsel, on brief), for plaintiff-appellant.

Stephen P. Groves, Young, Clement, Rivers & Tisdale, Charleston, S.C., argued (Carol B. Ervin, Young, Clement, Rivers & Tisdale, Charleston, S.C., Marvin C. Jones, Bogoslow & Jones, Walterboro, S.C., on brief), for defendants-appellees.

Before WILKINSON, NIEMEYER, and LUTTIG, Circuit Judges.

## OPINION

NIEMEYER, Circuit Judge:

John W. Stroman was discharged from his employment as a public school teacher in Colleton County, South Carolina, on May 29, 1987, after he wrote and circulated a letter to fellow teachers, complaining about a change that had been made in the method for paying teachers, criticizing the school district for budgetary mismanagement, and encouraging his fellow teachers to engage in a "sick-out" during the week of final examinations. Following his dismissal, Stroman filed suit under 42 U.S.C. § 1983 against the Colleton County School District and its officials, alleging that his dismissal was impermissibly based on his exercise of free speech and therefore violated the First Amendment. The district court granted defendants' motion for summary judgment, concluding that any protected speech in the letter was not a substantial or motivating factor for Stroman's discharge and that the portion of the letter proposing a "sick-out" did not constitute speech protected by the First Amendment. Although we disagree with some of the district court's reasoning, we nevertheless affirm for the reasons given hereafter.

I

Because of an impending budgetary crisis, the Colleton County School District announced in the spring of 1987 that, in lieu of paying teachers a lump sum for the summer months, as had been the custom, the School District would pay teachers bi-weekly.

John Stroman, a teacher for some ten years in Colleton County, responded to the new policy by writing and circulating a letter to fellow teachers in which he expressed his objection to any delay in receiving pay caused by the new policy, criticized the School District's management of the budget, and encouraged a "sick-out" during exam week to "show the administration that we are together as teachers" and "to take a stand." The letter read in relevant part:

Ha! Da! Ha! Ha! Ha!

Last year we got paid in all sorts of manners. This year is worse because we might have to wait for two pay periods before getting paid. Do you know that after the payroll on the 30th all of the money is supposed to be gone? Yes, Mr. Smoak and his convoy were not able to borrow the money on their most recent trip to New York. Everyone knows when you spend money for the coming year to pay off this year's salaries and don't ask to get more to replace it, the deficiency will grow and soon there will be no money. None. If in someway we are paid in June and the rest of the summer, next school year will be worse.

It seems as though the personnel downtown should be able to balance a budget. Do they really know just what's going on? God knows there are enough of them. Funny, Gene Odom was not on that convoy to the city. Just stop and

look around: at one school, I know they have seven administrators. Down at Central Office they have several positions filled that one person can do. Have we really grown that much? Funny how new positions are created for some administrators that were releived [sic] from another. These are positions we don't need or could be filled by someone with lower salaries. Make a *position* to full [sic] the *person*. People, we are *top-heavy* and can do nothing but sink. And we will be the ones to suffer.

\* \* \* \* \* \*

Some of us may not need all of our money, but some of us do. We must help one another because the next time you may need help. Just think of it. It is time the teachers in this County show the administration that we are together as teachers.

\* \* \* \* \* \*

Some of us will like to have a sick-out exam week if we can get about 10–25% to do so. If you are willing to take a stand with us, please let me (John Stroman) know by Wednesday, May 27, 1987.

\* \* \* \* \* \*

P.S. If you feel as strongly as I do, please discuss it and gather support.

On receiving a copy of the letter, the superintendent of the School District, A.L. Smoak, Jr., became concerned, in particular about the paragraph that proposed a "sick-out," which he marked with a red pencil. He promptly called a meeting with Stroman for the next day to which he also invited Stroman's school principal, Franklin L. Smalls. At the meeting, Stroman admitted that he had drafted and circulated the letter. He also complained to the superintendent that "he was being mistreated as far as his pay was concerned." During the course of the meeting, Smoak handed Stroman a letter of dismissal dated that day, May 29, 1987, which stated in pertinent part:

This letter is to inform you that you are dismissed and suspended from your duties as a teacher for the Colleton County School District effective immediately.

The suspension is imposed because I have found and concluded that cause exists for your dismissal and in my opinion immediate suspension is necessary to remove a substantial and material disruptive influence in the educational process at Colleton Middle School, Campus A. The grounds for dismissal are that you have shown evident unfitness for teaching by proposing to abandon your duties during the week of June 1, 1987, and by inciting and encouraging other teachers to leave their employment during the same week.

No other action was taken to avert the "sick-out," and nearly all of the faculty attended school during the examination period.

Stroman appealed the superintendent's decision and, following a hearing on June 7, 1989, the Colleton County Board of School Trustees affirmed. Stroman thereafter filed suit under 42 U.S.C. § 1983, contending, among other things, that he had been dismissed impermissibly for exercising his right to speak on issues of public importance. The district court granted the defendants' motion for summary judgment on the ground that Stroman's First Amendment rights were not violated. In analyzing Stroman's letter, the court divided it into two parts, "the portion criticizing the budgetary management, and the portion proposing the sick-out during exam week." The court found the section of the letter which dealt with management of the school budget to be protected speech but not the portion of the letter which encouraged the sick-out, and held that Stroman had offered no proof that his protected speech criticizing the budgetary management played a substantial or motivating role in his discharge. The court further held that, even assuming that the exercise of protected speech had played such a role in the dismissal, Stroman had failed to demonstrate that the same decision would not have been reached absent his exercise of protected speech. This appeal followed.

## II

█ The applicable principles are not disputed. A state may not dismiss a public

school teacher because of the teacher's exercise of speech protected by the First Amendment. *See Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Piver v. Pender County Board of Educ.,* 835 F.2d 1076 (4th Cir.1987), *cert. denied,* 487 U.S. 1206, 108 S.Ct. 2847, 101 L.Ed.2d 885 (1988). Speech by a public school teacher is protected by the First Amendment when (1) the teacher speaks as a citizen about matters of public concern and (2) the teacher's interest in exercising free speech is not outweighed by the countervailing interest of the state in providing the public service the teacher was hired to provide. The Supreme Court has thus instructed that when the accommodation of the teacher's right to comment as a citizen on public issues conflicts with the state's interest in providing a public education, the interests must be balanced to determine which is to prevail. *See Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734; *Piver,* 835 F.2d at 1078. Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). The limit of First Amendment protections was thus described in *Connick:*

> While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Id.* at 149, 103 S.Ct. at 1691.

■ Whether speech fairly relates to a public concern or expresses a private grievance or a matter of immediate self-interest must be determined by the content, the form, and the context of the speech. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690. And the issue is one of law, not fact, for the court to decide. *Id.* at 148 n. 7, 103

S.Ct. at 1690 n. 7; *Dwyer v. Smith,* 867 F.2d 184, 193 (4th Cir.1989).

■ Finally, in determining whether the teacher's discharge from employment was based on an exercise of conduct protected by the First Amendment, the teacher has the burden of proving that protected speech played a "substantial" role in the termination decision or was "a motivating factor." The employer may nevertheless rebut the showing by proof that it would have discharged the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Bd. of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The test thus becomes one of whether the teacher would have been retained or rehired "but for" his exercise of speech protected by the First Amendment. *Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 417, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979).

With these principles stated, we turn to the question of whether the letter circulated by Stroman was an exercise of First Amendment rights for which he could not permissibly have been discharged.

### III

■ Stroman contends that (1) the district court erred in dividing his letter into two parts for purposes of determining whether it constituted speech protected by the First Amendment; (2) the letter taken as a whole dealt with matters of public concern and was a motivating factor in the decision to fire him; (3) the School District failed to show that the letter actually "disrupted the operation of the school"; and (4) the School District failed to show that it would have fired Stroman even in the absence of the protected conduct.

The School District does not dispute the contention that circulation of the letter was the reason that Stroman was fired. It urges, however, that the letter represents an employee grievance and, as a matter of law, does not constitute commentary on a matter of public concern. The School District contends alternatively that the State's interests as a provider of public service and as an employer outweigh Stroman's First

Amendment interest in the letter, arguing in particular:

Stroman's act of promoting a strike during exam week was sheer insubordination. Such an action would surely inhibit the interest of Colleton County, as an employer, in promoting the efficiency of the public services it performs through its employees. [Internal quotations omitted]. It was clearly against settled policy to take sick leave unless ill.

In granting defendants' motion for summary judgment, the district court divided Stroman's letter into two parts, analyzing separately the letter's criticisms of the School District's budgetary management and its proposal that the teachers engage in a sick-out. The court found that while the first part of the letter constituted protected speech because it did not threaten any legitimate employer concerns about an efficient and effective workplace, it was not a motivating factor in the termination decision. The court found that the portion of Stroman's letter which advocated a sick-out, however, was not protected because it potentially created disharmony in the workplace, impeded Stroman's ability to perform his duties, and called into question the teacher's professional competence, and that it was this section that was the motivating factor in Stroman's discharge.

We agree with Stroman that it was improper for the district court to have divided his letter into discrete components to conduct a constitutional analysis on each. We conclude rather that the proper approach is to consider the letter as a single expression of speech to be considered in its entirety. We read the Court's decision in *Connick* to require just such an approach. There, an employee-circulated questionnaire that "touched upon matters of public concern in only a most limited sense" was nevertheless considered as a single expression of speech and subjected to a balancing of interests as established in *Pickering*. *Connick*, 461 U.S. at 154, 103 S.Ct. at 1693. Other courts have adopted a similar reading of *Connick*. *See, e.g., Johnsen v. Independent Sch. Dist.*, 891 F.2d 1485, 1492 (10th Cir.1989) (noting that "[c]ourts have cited *Connick* for the proposition that a

single instance of speech should not be divided for purposes of applying the *Pickering* balance"); *Kurtz v. Vickrey*, 855 F.2d 723, 732 n. 7 (11th Cir.1988) ("the Court [in *Connick*] applied the *Pickering* balance test to the survey *as a whole*, rather than to the single question relating to a matter of public concern"). We will therefore view the Stroman letter as a whole for purposes of a First Amendment analysis.

■ The School District urges us nevertheless to find that the letter taken as a whole amounts to no more than a personal grievance, thereby obviating the need for any further constitutional analysis. We agree that a personal grievance prompted the letter, which was written in response to a change in the practice of paying teachers in a lump sum for summer work. The substance of the letter, in large part, seems to be limited to this grievance. It opens with a recitation of the payment change and expresses a fear that the new practice, coupled with a budgetary crisis in the School District, might leave teachers without money. After criticizing School District management, the letter continues with the generalized complaint, "Some of us may not need all our money, but some of us do.... It is time the teachers in this County show the administration that we are together as teachers." The letter concludes with the proposal to engage in a "sick-out" during final exam week "to take a stand." The School District's position is further corroborated by Stroman's reiteration of his complaint at the May 29 meeting with the School District superintendent when he said that "he was being mistreated as far as his pay was concerned." Were this the entire evidence, we would readily agree that the speech amounted to no more than an employee grievance not protected by the First Amendment.

Some doubt, however, is raised by the complaints in the letter regarding school officials' alleged mismanagement of the budget. In addition to complaints about publicly funded out-of-town trips by School

District personnel, the letter observes that the administration cannot balance a budget and cannot cut unnecessary personnel. It states, "People, we are *top-heavy* and can do nothing but sink. And we will be the ones to suffer." While these types of comments could be construed as another part of the complaint of an employee unhappy with a change in a pay practice, they might also reflect the complaint of a citizen concerned about budget mismanagement, particularly if taken as a separate statement. *See Pickering*, 391 U.S. at 571–72, 88 S.Ct. at 1736 ("the question whether a school system requires additional funds is a matter of legitimate public concern.... Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal."). Any conclusion is further clouded by the on-going public debate in Colleton County, generated by cumulated deficits in the School District budget, over whether issuance of public revenue bonds would be necessary.

When speech arguably relates to a matter of public concern, we prefer to apply the approach taken in *Connick* and weigh whatever public interest commentary may be contained in the letter against the state's dual interest as a provider of public service and employer of persons hired to provide that service. *See Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734.

## IV

In its letter of dismissal to Stroman, the Colleton County School District focused on Stroman's proposal to call a "sick-out" during the week for which final examinations were scheduled. The letter stated as the cause for discharge:

> The grounds for dismissal are that you have shown evident unfitness for teaching by proposing to abandon your duties during the week of June 1, 1987, and by inciting and encouraging other teachers to leave their employment during the same week.

Stroman contends that there was no evidence to suggest that there was a danger that the sick-out would in fact occur and that his letter was only a proposal to engage in one. We think that this contention misses the point. The State's interest is not limited to preventing actual disruption. To have called for a sick-out when teachers were not sick was an appeal for dishonest conduct, conduct that was in violation of School District policy and the teachers' contracts, and conduct that could legitimately have been questioned on professional grounds. The School Board was prompted to fire Stroman not because a sick-out was likely to occur but rather because he exercised such flawed judgment in urging one. Stroman's letter revealed his willingness to abandon his post and to urge others to do likewise. As the Court in *Connick* observed:

> [W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.

461 U.S. at 152, 103 S.Ct. at 1692.

Public education is recognized as one of the most important public services offered by state government, and the maintenance of a professional and dedicated teaching staff to provide that service continuously ranks among the State's highest concerns.*

---

* For example, in 1749 Benjamin Franklin wrote:

> The good education of youth has been esteemed by wise men in all ages as the surest foundation of the happiness both of private families and of commonwealths. Almost all governments have therefore made it a principal object of their attention to establish and endow with proper revenues such seminaries of learning, as might supply the succeeding age with men qualified to serve the public with honor to themselves and to their country.
>
> \* \* \* \* \* \*
>
> For though the American youth are allowed not to want capacity; yet the best capacities require cultivation, it being truly with them, as with the best ground, which, unless well tilled and sowed with profitable seed, produces only ranker weeds.

When South Carolina subscribed to an interstate Compact for Education, a formal arrangement among subscribing states for the development of ideas and policies and the exchange of information relating to education, it agreed that "the proper education of all citizens is one of the most important responsibilities of the states to preserve a free and open society in the United States." S.C.Code § 59–11–10. In providing public education, the State therefore expects to enter into employer-employee relationships with teachers that permit it to assure delivery of the service in a manner that best serves the students and the community. State requirements for the attendance of teachers and their supervision of the students are therefore both necessary and desirable.

Thus, it is not surprising that the Colleton County School District has adopted regulations that require teachers to remain professional in their relationships with students and that impose on teachers the duty of student supervision. For example, in defining a teacher's job, School District policy provides:

No group of children, either in the classroom or on the playground, should be left unattended by the teacher....

Teachers shall be in attendance at their schools fifteen minutes prior to the time that their pupils report, and shall remain in their classrooms fifteen minutes after the official dismissal of school and at such periods as deemed necessary by the Principal, Directors of Schools, or the Superintendent.

Recognizing necessary exceptions to the attendance policy, the School District also grants sick leave and personal days. But sick leave is limited for use during sickness, maternity leave, personal disability, and the sickness of immediate family members. While the policy also permits that two days of sick leave per year may be used for "personal leave," it prohibits use of personal leave days during "semester and yearly examination periods."

Therefore, when Stroman proposed to take a sham sick-leave during the final examination period and urged others to do so to protest and "take a stand," he suborned a misrepresentation about sick leave and encouraged a deliberate violation of regulation and employment terms, for which the provided sanction is dismissal. He also took aim at established standards of professionalism by urging teachers to abandon their duties during exam week when supervision would be particularly needed.

■ We recognize that, in deciding to enter the public teaching profession, a citizen does not waive or forfeit his right to comment on matters of public concern. But he can be expected, when doing so, to elect a method which does not frustrate provision of the service he is employed to provide. This is particularly so when other methods of speech and conduct are readily available to communicate his concern.

■ We therefore hold that any First Amendment interest inherent in the letter that Stroman circulated is outweighed by the *public interest* in having public education provided by teachers loyal to that service and, in particular, in having final examinations proctored and completed in a timely fashion, and the School District's *employer interest* in having its employees abide by reasonable policies adopted to control sick leave and maintain morale and effective operation of the schools. We recognize that Stroman's comments about the School District's purported mismanagement may involve matters of public concern. Nevertheless, we view the essential thrust of the letter as expressing an employee grievance about changes in the method of pay. Thus we believe that the Supreme Court's conclusion in *Connick* is equally applicable here:

Myers' questionnaire touched upon matters of public concern in only a most limited sense; her survey, in our view, is most accurately characterized as an employee grievance concerning internal office policy. The limited First Amend-

A Plan for The Education of Youth in Pennsylvania, from *The Benjamin Franklin Reader* (Na-

than G. Goodman ed., reprinted in *The College Years,* A.C. Spectorsky ed., 1958).

**160**

ment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. Myers' discharge therefore did not offend the First Amendment.

461 U.S. at 154, 103 S.Ct. at 1693.

The judgment of the district court is, for the reasons that we have given, affirmed.

AFFIRMED.