**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-2066**

MARK GRUTZMACHER,

                    Plaintiff,

         and

KEVIN PATRICK BUKER,

                    Plaintiff – Appellant,

         v.

HOWARD COUNTY; CHIEF WILLIAM F. GODDARD, III; JOHN JEROME;
JOHN S. BUTLER,

                    Defendants – Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Marvin J. Garbis, District Judge. (1:13−cv−03046−MJG)

Argued: December 7, 2016                          Decided: March 20, 2017

Before GREGORY, Chief Judge, and WYNN and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Chief Judge
Gregory and Judge Thacker joined.

**ARGUED:** Edward Scott Robson, ROBSON & ROBSON, PC, King of Prussia, Pennsylvania, for Appellant. Cynthia G. Peltzman, HOWARD COUNTY OFFICE OF LAW, Ellicott City, Maryland, for Appellees. **ON BRIEF:** David G.C. Arnold, LAW OFFICE OF DAVID ARNOLD, King of Prussia, Pennsylvania, for Appellant. Gary W. Kuc, County Solicitor, Faith R. Adelman, Senior Assistant County Solicitor, HOWARD COUNTY OFFICE OF LAW, Ellicott City, Maryland, for Appellees.

WYNN, Circuit Judge:

Plaintiff Kevin Patrick Buker is a former Battalion Chief with the Howard County, Maryland Department of Fire and Rescue Services (the "Department"). Defendants are Howard County, Maryland; former Howard County Fire Chief William F. Goddard, III ("Chief Goddard"); former Howard County Deputy Chief John Butler ("Deputy Chief Butler");[1] and Howard County Assistant Chief John Jerome ("Assistant Chief Jerome," and collectively with Howard County, Chief Goddard, and Deputy Chief Butler, "Defendants").

Plaintiff brought this matter in the District Court for the District of Maryland, at Baltimore, alleging that Defendants retaliatorily fired him for exercising his First Amendment free-speech rights and, second, that the Department's social media policy, which played a role in Plaintiff's termination, was facially unconstitutional under the First Amendment. This appeal arises from the district court's orders granting summary judgment in favor of Defendants on Plaintiff's First Amendment retaliation claim and dismissing as moot Plaintiff's facial challenge to the social media policy. On review, we affirm the judgment of the district court.

I.

A.

---

[1] Butler was appointed as Fire Chief in January 2015, following Fire Chief Goddard's retirement.

The Department employed Plaintiff as a paramedic for the Howard County Fire Department from 1997 through 2012. In 2012, Chief Goddard promoted Plaintiff to the rank of battalion chief and assigned Plaintiff to the second battalion as its commander. According to Chief Goddard, as a battalion chief, Plaintiff was responsible for "manag[ing] the day-to-day operations of the field," as well as "ensur[ing] . . . the policies and procedures as written in the department are complied with." J.A. 139.

As a paramilitary-type organization, the Department executes the enforcement of its orders in a hierarchical manner that requires employees to strictly follow a chain-of-command. At the top of the Department's chain-of-command is the fire chief, followed by deputy fire chiefs, assistant chiefs, battalion chiefs, and, lastly, first responders. Although positioned at the lower end of the chain-of-command, Chief Goddard described the rank of battalion chief as "the most critical leadership position in the organization," as battalion chiefs directly supervise first responders. J.A. 138.

In 2011, Chief Goddard, along with the Department's public information officer, began drafting a social media policy for the Department, partially in response to national debate about the use of social media within fire and emergency services departments. The Department's decision to develop a social media policy also stemmed from an incident involving a Howard County volunteer firefighter posting to Facebook a photograph of a lynching, depicted by a noosed, brown beer bottle surrounded by white beer cans with paper cones for hoods. In a comment accompanying the photograph, the volunteer firefighter said that he "[w]ant[ed] to go fishing for mud sharks / there are way to many here in Maryland. They are not good to eat though, I hear they taste like

4

decayed chicken." J.A. 835; Dist. Ct. Dkt. 40-4, at 5; Dist. Ct. Dkt. 40-7, at 3; Dist. Ct. Dkt. 40-24. Throughout the drafting process, the Department provided internal stakeholders—including Plaintiff, as well as all of the other battalion chiefs—opportunities to review and comment on the forthcoming policy.

On November 5, 2012, the Department issued General Order 100.21, entitled "Social Media Guidelines," which set forth the Department's policy regarding the use of social media by Department personnel. Under the Social Media Guidelines, the Department prohibited personnel "from posting or publishing any statements, endorsements, or other speech, information, images or personnel matters that could reasonably be interpreted to represent or undermine the views or positions of the Department, Howard County, or officials acting on behalf of the Department or County." J.A. 32. The Social Media Guidelines also barred Department employees "from posting or publishing statements, opinions or information that might reasonably be interpreted as discriminatory, harassing, defamatory, racially or ethnically derogatory, or sexually violent when such statements, opinions or information, may place the Department in disrepute or negatively impact the ability of the Department in carrying out its mission." J.A. 32. Additionally, the Social Media Guidelines prohibited Department personnel from "post[ing] any information or images involving off-duty activities that may impugn the reputation of the Department or any member of the Department." J.A. 32.

Further, on December 6, 2012, the Department issued General Order 100.22, entitled "Code of Conduct," which was "aimed at ensuring members of the Department maintain the highest level of integrity and ethical conduct both on and off duty." J.A. 34.

5

In relevant part, the Code of Conduct prohibited Department personnel from "intentionally engag[ing] in conduct, through actions or words, which are disrespectful to, or that otherwise undermines the authority of, a supervisor or the chain of command" and "publicly criticiz[ing] or ridicul[ing] the Department or Howard County government or their policies." J.A. 38–39. The Code of Conduct also required "[m]embers [to] conduct themselves at all times, both on and off duty, in such a manner as to reflect favorably on the Department." J.A. 38. The Code of Conduct further prohibited Department employees from engaging in "[c]onduct unbecoming" to the Department, which it defined as "any conduct that reflects poorly on an individual member, the Department, or County government, or that is detrimental to the public trust in the Department or that impairs the operation and efficiency of the Department." J.A. 38.

On January 20, 2013, Plaintiff was watching news coverage of a gun control debate in his office and posted the following statement to his Facebook page while on-duty[2]:

> My aide had an outstanding idea . . lets all kill someone with a liberal . . . then maybe we can get them outlawed too!  Think of the satisfaction of beating a liberal to death with another liberal . . . its almost poetic . . .

J.A. 82–83 (ellipses in original). Twenty minutes later, Mark Grutzmacher, a county volunteer paramedic, replied to Plaintiff's earlier post with the following comment:

---

[2] We reproduce the Facebook posts and comments as they appear in the record and without the benefit of editing.

6

> But . . . . was it an "assult liberal"? Gotta pick a fat one, those are the "high capacity" ones. Oh . . . pick a black one, those are more "scary". Sorry had to perfect on a cool idea!

J.A. 84 (ellipses in original). Six minutes later, Plaintiff "liked" Grutzmacher's comment and replied, "Lmfao! Too cool Mark Grutzmacher!" J.A. 85.

Two Department employees subsequently forwarded Plaintiff's and Grutzmacher's Facebook posts to another battalion chief within the Department. On January 22, 2013, that battalion chief sent a screenshot of Plaintiff's initial Facebook post to Assistant Chief Jerome with a text message stating, "Chief, not sure this is something that should be displayed from one of our battalion chiefs." J.A. 82. Assistant Chief Jerome then contacted his direct supervisor, Deputy Chief Butler, along with another assistant chief, regarding Plaintiff's Facebook posts. Later that day, the three chiefs met to discuss whether Plaintiff's posts violated the Social Media Guidelines or Code of Conduct and, if so, what corrective measures the Department would take. Following their meeting, Assistant Chief Jerome emailed Plaintiff, directing him to review his recent Facebook posts and to remove anything inconsistent with the Department's social media policy. Though Plaintiff maintained that he was in compliance with the social media policy, Plaintiff removed the January 20 posts.

On January 23—a few hours after Plaintiff informed Assistant Chief Jerome that he had removed the posts—Plaintiff posted the following to his Facebook "wall":

> To prevent future butthurt and comply with a directive from my supervisor, a recent post (meant entirley in jest) has been deleted. So has the complaining party. If I offend you, feel free to delete me. Or converse with me. I'm not scared or ashamed of my opinions or political leaning, or religion. I'm happy to discuss any

7

of them with you. If you're not man enough to do so, let me know, so I can delete you. That is all. Semper Fi! Carry On.

J.A. 96. One of Plaintiff's Facebook friends then replied, "As long as it isn't about the [Department], shouldn't you be able to express your opinions?" J.A. 96. Plaintiff responded:

> Unfortunately, not in the current political climate. Howard County, Maryland, and the Federal Government are all Liberal Democrat held at this point in time. Free speech only applies to the liberals, and then only if it is in line with the liberal socialist agenda. County Governement recently published a Social media policy, which the Department then published it's own. It is suitably vague enough that any post is likely to result in disciplinary action, up to and including termination of employment, to include this one. All it took was one liberal to complain . . . sad day. To lose the First Ammendment rights I fought to ensure, unlike the WIDE majority of the Government I serve.

J.A. 96 (ellipses in original). Another of Plaintiff's Facebook friends then commented, "Oh, your gonna get in trouble for saying that too." J.A. 96. "Probably . . .," Plaintiff replied. J.A. 96.

The following day, January 24, a captain in the Department emailed Chief Goddard a screenshot of Plaintiff's January 23 Facebook posts. The captain also emailed Deputy Chief Butler and an assistant chief a "summary of the Buker issue," in which he noted the "racial overtones" of Grutzmacher's comment on Plaintiff's January 20 Facebook post. J.A. 101. The captain stated that by replying to the comment, Plaintiff "endorsed" Grutzmacher's racially charged statement. J.A. 101. The captain also characterized Plaintiff's January 23 posts as "insubordinate toward [management]." J.A. 101. The captain suggested treating the incidents "like any other investigation" and determining any disciplinary action "after the conclusion of the investigation." J.A. 101.

8

The next day, the Department moved Plaintiff out of field operations to an administrative assignment pending the results of an internal investigation.

Approximately three weeks later, on February 17, 2013, Mike Donnelly, a member of a Department-affiliated volunteer company, posted to his own Facebook page a picture of an elderly woman with her middle finger raised. Overlaid across the picture was the following caption: "THIS PAGE, YEAH THE ONE YOU'RE LOOKING AT IT'S MINE[.] I'LL POST WHATEVER THE FUCK I WANT[.]" J.A. 100. Above the picture, Donnelly wrote, "for you Chief." J.A. 100. Plaintiff, who was one of Donnelly's Facebook friends, "liked" the photograph.

Chief Goddard served Plaintiff with charges of dismissal on February 25. The charges referenced Plaintiff's: (1) January 20 and January 23 Facebook posts; (2) "like" of and reply to Grutzmacher's January 20 comment; (3) replies to comments on Plaintiff's January 23 post; and (4) "like" of Donnelly's February 17 post.[3] The charges asserted that these posts violated the Department's Code of Conduct and Social Media

_____

[3] We observe that the act of "liking" a Facebook post makes the post attributable to the "liker," even if he or she did not author the original post. *See Bland v. Roberts*, 730 F.3d 368, 386 (4th Cir. 2013), *as amended* (Sept. 23, 2013) ("[C]licking on the 'like' button literally causes to be published the statement that the User 'likes' something, which is itself a substantive statement. . . . That a user may use a single mouse click to produce that message . . . instead of typing the same message with several individual key strokes is of no constitutional significance.").

Accordingly, for ease of reference, we refer to Plaintiff's various Facebook posts, comment replies, and "likes," collectively, as Plaintiff's "Facebook activity" or "speech."

9

Guidelines. In particular, the charging document asserted, among other things, that Plaintiff's Facebook activity improperly:

- "[A]dopted" and "approv[ed]" Grutzmacher's comment, which "had racial overtones and was insensitive and derogatory in nature";

- Reflected a "[f]ailure to grasp the impact and implications of [the] comments" on Plaintiff's "leadership position within the Department as a Battalion Chief," in which Plaintiff was "responsible for enforcing Department policies and taking appropriate action for violations of those policies by the people [he] supervise[d]";

- Demonstrated "repeated insolence and insubordination" by replacing the January 20 post "with another posting tirade mocking the Chain-of-Command, the Department, and the County"; and

- "[I]nterfered with Department operations" and caused "disruption [in] the Department's Chain-of-Command and authority."

J.A. 105.

Chief Goddard provided Plaintiff with an opportunity to rebut the specific charges at a pre-termination meeting held on March 8. Following that meeting, on March 14, 2013, Chief Goddard terminated Plaintiff's employment with the Department.

B.

On October 12, 2013, Plaintiff brought an action under 42 U.S.C. § 1983 in federal district court seeking reinstatement and damages. Plaintiff alleged that his Facebook posts were a substantial motivation for his termination and that, by terminating him, the Department impermissibly retaliated against Plaintiff for exercising his First Amendment rights. Plaintiff also alleged that the Department's Social Media Guidelines and Code of Conduct, as drafted and applied to Plaintiff, violated the First Amendment by impermissibly restricting Department employees' ability to speak on matters of public

10

concern. The district court later construed the second of Plaintiff's claims as a facial challenge to the Department's Social Media Guidelines and Code of Conduct.

Following discovery, Defendants moved for summary judgment, arguing that Plaintiff's Facebook activity did not involve matters of public concern and that Plaintiff's interest in speaking did not outweigh the Department's interest in minimizing disruption. Defendants later filed a second motion for summary judgment as to Plaintiff's facial-challenge claims, arguing that the Department's policies were not unconstitutionally overbroad or vague and did not constitute prior restraints.

The district court granted Defendants' first summary judgment motion on March 30, 2015. *Buker v. Howard County.*, Nos. MJG–13–3046, MJG–13–3747, 2015 WL 3456750 (D. Md. May 27, 2015). In doing so, the district court concluded that Plaintiff's January 20 Facebook posts and "like" were unprotected speech because they were "capable of impeding the [Fire Department]'s ability to perform its duties efficiently." *Id.* at *13 (alteration in original) (internal quotation marks omitted) (quoting *Duke v. Hamil*, 997 F. Supp. 2d 1291, 1302 (N.D. Ga. 2014)). The district court further concluded that Plaintiff's January 23 posts and February 17 "like" similarly did not amount to protected speech because Plaintiff failed to show that he was speaking as a citizen on a matter of public concern. *Id.* at *13–14. The district court's memorandum decision and order did not, however, address Defendants' second motion for summary judgment, leaving unresolved Plaintiff's facial challenge.

On June 22, 2015, the Department replaced its Social Media Guidelines and Code of Conduct policies with revised versions. The revised version of the Social Media

11

Guidelines eliminated many of the earlier version's prohibitions on Department personnel's private use of social media. And the revised Code of Conduct did not include any of the provisions in the previous version that Plaintiff had challenged. Highlighting these changes, Defendants moved to dismiss Plaintiff's facial challenge as moot, arguing that the Department's revised policies did not contain the provisions Plaintiff challenged as overbroad, void for vagueness, or prior restraints. The district court thus denied Defendants' earlier motion for summary judgment as moot and granted Defendants' motion to dismiss on August 12, 2015.

Plaintiff timely appealed the district court's (1) award of summary judgment in favor of Defendants on Plaintiff's First Amendment retaliation claim and (2) dismissal on mootness grounds of Plaintiff's facial challenge to the Social Media Guidelines and Code of Conduct.

## II.

## A.

On appeal, Plaintiff first argues that the district court erred in granting summary judgment in favor of Defendants on his First Amendment retaliation claim. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party."

*Smith v. Gilchrist*, 749 F.3d 302, 307 (4th Cir. 2014) (quoting *T-Mobile Ne. LLC v. City Council of Newport News*, 674 F.3d 380, 384–85 (4th Cir. 2012)).

From the outset, we point out that "[t]he First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). "Protection of the public interest in having debate on matters of public importance is at the heart of the First Amendment." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 573 (1968)).

To resolve Plaintiff's appeal, we start by considering the First Amendment rights of public employees. Public employees do not "relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick*, 461 U.S. at 140. To the contrary, the Supreme Court has long recognized

> that public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public. Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues.

*City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam) (citing *Pickering*, 391 U.S. at 572). To that end, the Supreme Court has repeatedly "underscored the 'considerable value' of 'encouraging, rather than inhibiting, speech by public employees. For government employees are often in the best position to know what ails the agencies for which they work.'" *Hunter v. Town of Mocksville*, 789 F.3d 389, 396 (4th Cir. 2015) (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014)). As such, we do not take lightly

13

"[o]ur responsibility . . . to ensure that citizens are not deprived of fundamental rights by virtue of working for the government." *Connick*, 461 U.S. at 147.

"That being said, precedent makes clear that courts must also consider 'the government's countervailing interest in controlling the operation of its workplaces.'" *Hunter*, 789 F.3d at 397 (quoting *Lane*, 134 S. Ct. at 2377). Just as there is a "public interest in having free and unhindered debate on matters of public importance," *Pickering*, 391 U.S. at 573, "[t]he efficient functioning of government offices is a paramount public interest," *Robinson v. Balog*, 160 F.3d 183, 189 (4th Cir. 1998). Therefore, a public employee "by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). In particular, under the balancing test developed by the Supreme Court in *Pickering* and *Connick*, "the First Amendment does not protect public employees when their speech interests are outweighed by the government's interest in providing efficient and effective services to the public." *Lawson v. Union Cty. Clerk of Court*, 828 F.3d 239, 247 (4th Cir. 2016).

Regarding Plaintiff's retaliation claim, "a public employer contravenes a public employee's First Amendment rights when it discharges . . . '[the] employee . . . based on the exercise of' that employee's free speech rights." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 316 (4th Cir. 2006) (alteration in original) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)). To state a claim under the First Amendment for retaliatory discharge, a plaintiff must satisfy the three-prong test set forth in *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998). In particular, the plaintiff must show: (1) that he was a "public employee . . . speaking as a citizen upon a matter of

14

public concern [rather than] as an employee about a matter of personal interest;" (2) that his "interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public;" and (3) that his "speech was a substantial factor in the employer's termination decision." 157 F.3d at 277–78.

The district court found that Plaintiff's January 20 speech failed on the second prong of the *McVey* test, and that Plaintiff's January 23 and February 17 speech failed on the first *McVey* prong. *Buker*, 2015 WL 3456750, at \*9–14. Plaintiff urges us to reverse the district court's grant of summary judgment to Defendants and, in doing so, makes two arguments. First, Plaintiff argues that the district court erred in granting summary judgment when there remained a factual dispute regarding whether Plaintiff could meet his burden under the *McVey* test's second prong. Specifically, Plaintiff maintains that his January 20 speech did not disrupt the Department or cause a reasonable apprehension of disruption, such that the Department's interest in maintaining an efficient workplace outweighed Plaintiff's interest in speaking. Second, Plaintiff argues that the district court erred in finding that his January 23 and February 17 posts and "like" were not on a matter of public concern and, therefore, failed *McVey*'s first prong. For the reasons below, we hold that the district court properly granted summary judgment to Defendants.

1.

We first address whether Plaintiff's Facebook posts and "likes" addressed matters of public concern. In determining whether speech addresses matters of public concern, "we examine the content, context, and form of the speech at issue in light of the entire

15

record." *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) (en banc). "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Id.* This "public-concern inquiry centers on whether 'the public or the community is likely to be truly concerned with or interested in the particular expression.'" *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004) (quoting *Arvinger v. Mayor of Baltimore*, 862 F.2d 75, 79 (4th Cir. 1988)); *see also Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 352–53 (4th Cir. 2000) ("This is a subtle, qualitative inquiry; we use the content, form, and context as guideposts in the exercise of common sense, asking throughout: would a member of the community be truly concerned with the employee's speech?").

Conversely, "[i]n the absence of unusual circumstances, a public employee's speech 'upon matters only of personal interest' is not afforded constitutional protection." *Seemuller v. Fairfax Cty. Sch. Bd.*, 878 F.2d 1578, 1581 (4th Cir. 1989) (quoting *Connick*, 461 U.S. at 147); *see also Jurgensen v. Fairfax County*, 745 F.2d 868, 879 (4th Cir. 1984) ("If the speech relates primarily to a matter of 'limited public interest' and . . . center[s] instead on matters primarily, if not exclusively 'of personal interest' to the employee . . . that fact must be weighed in determining whether a matter of true public concern is involved . . . ."). To that end, "[t]he Supreme Court has warned us to guard against 'attempt[s] to constitutionalize the employee grievance.'" *Brooks v. Arthur*, 685 F.3d 367, 373 (4th Cir. 2012) (second alteration in original) (quoting *Connick*, 461 U.S. at 154). Accordingly, "[p]ersonal grievances[ and] complaints about conditions of employment . . . do not constitute speech about matters of public concern." *Campbell v.*

16

*Galloway*, 483 F.3d 258, 267 (4th Cir. 2007) (internal quotation marks omitted) (quoting *Stroman v. Colleton Cty. Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992)). Likewise, we must also "ensure that matters of internal policy, including mere allegations of favoritism, employment rumors, and other complaints of interpersonal discord, are not treated as matters of public policy." *Goldstein*, 218 F.3d at 352.

Set against this backdrop, at least some of Plaintiff's Facebook activity referenced in the Department's charging document touched on issues of public concern. In particular, Plaintiff's and Grutzmacher's January 20, 2013, discussion about "liberal[s]" and "assault liberal[s]" was, according to an expert report submitted by Plaintiff, a commentary on gun control legislation using "a lexicon that is extremely common in contemporary American gun culture." J.A. 566–71. The report maintains that Plaintiff's and Grutzmacher's exchange reflects a "well-known meta-narrative" under which "'liberal' . . . is a collectivist ideologue, a statist, who believes in the absolute power of government even at the expense of individual autonomy and rights, including an individual's right to own, carry and use firearms." J.A. 567–68. Courts have long recognized that "[t]he debate over the propriety of gun control legislation is . . . a matter of public concern." *Thomas v. Whalen*, 51 F.3d 1285, 1290 (6th Cir. 1995). Consequently, the "liberal" and "assault liberal" post and comment implicated a matter of public concern.

Likewise, Plaintiff's January 23, 2013, post describing the Department's Social Media Guidelines and expressing concern that those guidelines infringed on Plaintiff's First Amendment rights also addressed a matter of public concern. As explained above,

17

the public employee speech doctrine recognizes the unique role government employees—individuals who "are often in the best position to know what ails the agencies for which they work"—play in keeping the electorate informed about the operations of public employers. *See Liverman v. City of Petersburg*, 844 F.3d 400, 408 (4th Cir. 2016) (internal quotation marks omitted) (quoting *Waters v. Churchill*, 511 U.S. 661, 674 (1994) (plurality opinion)). To that end, the interest advanced by the public employee speech doctrine "is as much *the public's interest in receiving informed opinion* as it is the employee's own right to disseminate it." *Roe*, 543 U.S. at 82 (emphasis added); *see also Garcetti*, 547 U.S. at 419 ("The Court has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion."); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 470 (1995) ("The large-scale disincentive to Government employees' expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said."). Because the public has an interest in receiving the "informed" opinions of public employees, it necessarily also has an interest in information about policies that circumscribe public employees' speech and public employees' opinions of such policies.

However, we also acknowledge that some of the Facebook activity prompting Plaintiff's termination did not implicate matters of public concern. For instance, Plaintiff's "like" of the image depicting an elderly woman raising her middle finger and entitled "for you Chief"—on the heels of the Department's investigation into Plaintiff's

18

January 20 and 23 Facebook activity—"amounted to no more than an employee grievance not protected by the First Amendment." *Stroman*, 981 F.2d at 157.

When "a single expression of speech" encompasses both matters of public concern and matters of purely personal interest, "the proper approach is to consider [the speech] . . . in its entirety." *Id.* Whether a series of related posts and "likes" over a several-week period to a dynamic social networking platform—like the posts and "likes" that prompted Plaintiff's termination—constitute "a single expression of speech" is an open question. Rather than resolve that unsettled question—and because at least some of Plaintiff's speech addressed matters of public concern—we will "weigh whatever public interest commentary may be contained in [Plaintiff's Facebook activity] against the [Department's] dual interest as a provider of public service and employer of persons hired to provide that service." *Id.* at 158 (citing *Pickering*, 391 U.S. at 568). We note that this approach accords with the Department's decision to terminate Plaintiff, which was based on the "public statements [Plaintiff] made over a number of days (not simply one incident—one day)" and "the totality of the circumstances [of] his violations." J.A. 119, 242.

## 2.

Having concluded that at least some of the Facebook activity prompting Plaintiff's termination implicated matters of public concern, we now must determine "whether [Plaintiff's] interest in speaking upon the matter[s] of public concern outweighed the [Department's] interest in providing effective and efficient services to the public."

19

*McVey*, 157 F.3d at 277.[4]  "Whether [an] employee's interest in speaking outweighs the government's interest is a question of law for the court."  *Smith*, 749 F.3d at 309.  In balancing these interests, we must "consider the context in which the speech was made, including the employee's role and the extent to which the speech impairs the efficiency of the workplace."  *Id.* (citing *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

> Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

*Ridpath*, 447 F.3d at 317 (citing *McVey*, 157 F.3d at 278).

To demonstrate that an employee's speech impaired efficiency, a government employer need not "prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'"  *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992) (quoting *Jurgensen*, 745 F.2d at 879); *see also Durham v. Jones*, 737 F.3d 291, 302 (4th Cir. 2013) ("While [it] is correct that 'concrete evidence' of an actual disruption is not required, there must still be a reasonable apprehension of such a disruption.").  Additionally, this Court has previously recognized that "[a] social

---

[4] Although the district court concluded that Plaintiff's January 23 and February 17 Facebook activity did not address matters of public concern, *Buker*, 2015 WL 3456750, at *13–14, "[o]ur review is not limited to the grounds the district court relied upon, and we may affirm 'on any basis fairly supported by the record,'" *Lawson*, 828 F.3d at 247 (quoting *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 222 (4th Cir. 2002)).

media platform amplifies the distribution of the speaker's message—which favors the employee's free speech interests—but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency." *Liverman*, 844 F.3d at 407.

For several reasons, we conclude that the Department's interest in efficiency and preventing disruption outweighed Plaintiff's interest in speaking in the manner he did regarding gun control and the Department's social media policy. First, Plaintiff's Facebook activity interfered with and impaired Department operations and discipline as well as working relationships within the Department. "[F]ire companies have a strong interest in the promotion of camaraderie and efficiency" as well as "internal harmony [and] trust," and therefore we accord "substantial weight" to a fire department's interest in limiting dissension and discord. *Goldstein*, 218 F.3d at 355; *see also Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 26 (2d Cir. 1979) ("When lives may be at stake in a fire, an *esprit de corps* is essential to the success of the joint endeavor. Carping criticism and abrasive conduct have no place in a small organization that depends upon common loyalty—'harmony among coworkers.'" (quoting *Pickering*, 391 U.S. at 570)).

Here, Plaintiff's Facebook activity led to "dissension in the [D]epartment" and resulted in "[n]umerous" conversations between at least one battalion chief and lower-level employees in which the battalion chief "had to[,] . . . as a supervisor[,] justify[] that it's okay for anybody to say or do anything against the policy." J.A. 550. Additionally, at least one lieutenant perceived Grutzmacher's comment regarding "picking a black one," which Plaintiff "liked," as "referr[ing] to a black person." J.A. 337. Three

21

African-American employees within the Department approached the president of the Phoenix Sentinels—the Howard County affiliate of the International Association of Black Professional Firefighters, a constituent group representing African-American and other minority firefighters—about the posts, with one member stating, "I don't want to work for [Plaintiff] anymore. I don't trust him."[5]  J.A. 240.  Accordingly, we accord "substantial weight" to Defendants' interest in preventing Plaintiff from causing further dissension and disharmony.

Second, Plaintiff's Facebook activity significantly conflicted with Plaintiff's responsibilities as a battalion chief.  Courts have long recognized that "[t]he expressive activities of a highly placed supervisory . . . employee will be more disruptive to the operation of the workplace than similar activity by a low level employee with little authority or discretion."  *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir. 1997) (citing authorities); *see also Brown v. Dep't of Transp.*, 735 F.2d 543, 547 (Fed. Cir. 1984) ("[Plaintiff's] position as a supervisor . . . weighs heavily on the agency's side.").  As a leader within the Department, Plaintiff was responsible for acting as an impartial decisionmaker and "enforcing Departmental policies and taking appropriate action for violations of those policies."  J.A. 105.  The record demonstrates that Plaintiff's actions

---

[5] Although Plaintiff maintains that this testimony is inadmissible hearsay and that the district court should not have considered it, the district court did not rely on the statement for the truth of the matter asserted, but relied on it to illustrate the disruptive effect of Plaintiff's speech. *See United States v. Pratt*, 239 F.3d 640, 644 (4th Cir. 2001) (finding that an out-of-court statement not intended to prove the truth of the matter asserted is not hearsay and, thus, is not excluded by the hearsay rule).  Thus, the district court did not err in considering this testimony.

led to concerns regarding Plaintiff's fitness as a supervisor and role model, and concerns that Plaintiff's subordinates would not take him seriously if Plaintiff tried to discipline them in the future. By flouting Department policies he was expected to enforce, Plaintiff "violated the trust [his inferiors] have in him to be in his administrative role as a battalion chief, because people count on him to be fair." J.A. 226–27. Accordingly, Plaintiff's managerial position also weighs in the Department's favor.

Third, Plaintiff's speech frustrated the Department's public safety mission and threatened "community trust" in the Department, which is "vitally important" to its function. J.A. 284–85. "[T]he more the employee's job requires . . . public contact, the greater the state's interest in firing her for expression that offends her employer." *McEvoy*, 124 F.3d at 103 (alteration in original) (internal quotation marks omitted) (quoting Craig D. Singer, Comment, *Conduct and Belief: Public Employees' First Amendment Rights to Free Expression and Political Affiliation*, 59 U. Chi. L. Rev. 897, 901 (1992)). "[F]irefighters . . . are quintessentially public servants. As such, part of their job is to safeguard the public's opinion of them, particularly with regard to a community's view of the respect that . . . firefighters accord the members of that community." *Locurto v. Giuliani*, 447 F.3d 159, 178–79 (2d Cir. 2006).

Here, Plaintiff's January 20 post, made while he was on-duty and in his office, "advocat[ed] violence to certain classes of people" and "advocated using violence to [e]ffect a political agenda." J.A. 183, 646. Additionally, the Department reasonably was concerned that Plaintiff's Facebook activity—particularly his "like" of Grutzmacher's comment regarding "black one[s]"—could be interpreted as supporting "racism" or

23

"bias," J.A. 283, and thereby "interfere with the public trust of [Plaintiff] being able to make fair decisions for everybody," J.A. 231; *see also Locurto*, 447 F.3d at 182–83 ("[E]ffective police and fire service presupposes respect for the members of [African-American and other minority] communities, and the defendants were permitted to account for this fact in disciplining the plaintiffs."). The potential for Plaintiff's statements to diminish the Department's standing with the public further weighs in favor of the Department.

Fourth, Plaintiff's speech—particularly his "like" of the image depicting a woman raising her middle finger—"expressly disrespect[ed] [his] superiors." *LeFande v. District of Columbia*, 841 F.3d 485, 495 (D.C. Cir. 2016). A public employee's interest in speaking on matters of public concern "does not require that [a public] employer[] tolerate associated behavior that [it] reasonably believed was disruptive and insubordinate." *Dwyer v. Smith*, 867 F.2d 184, 194 (4th Cir. 1989); *see also Connick*, 461 U.S. at 154 ("The limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships."). Here, Plaintiff's "continued unrestrained conduct" after already being reprimanded "'smack[ed] of insubordination.'" *See Graziosi v. City of Greenville*, 775 F.3d 731, 740 (5th Cir. 2015) (quoting *Nixon v. City of Houston*, 511 F.3d 494, 499 (5th Cir. 2007)). Employees within the Department viewed Plaintiff's "like" of Donnelly's Facebook picture of an older woman with her middle finger raised as a "sparring match between the battalion chief and an assistant chief [that publicly] escalated to the level of telling the fire chief to fuck off."

24

J.A. 297–98. Therefore, the disrespectful and insubordinate tone of Plaintiff's relevant Facebook activity also weighs in the Department's favor.

Lastly, we observe that the record is rife with observations of how Plaintiff's Facebook activity, subsequent to Assistant Chief Jerome's request that Plaintiff remove any offending posts, disregarded and upset the chain of command upon which the Department relies. Fire departments operate as "paramilitary" organizations in which "discipline is demanded, and freedom must be correspondingly denied." *Maciariello*, 973 F.2d at 300. Accordingly, we afford fire departments "greater latitude . . . in dealing with dissension in their ranks." *Id.* Although the Department's status as a paramilitary organization is not dispositive of the *Pickering* analysis, *see Liverman*, 844 F.3d at 408, it does further tip the scale in the Department's favor.

By contrast, though we recognize that at least some of Plaintiff's speech addressed matters of public concern—gun control and the Department's Social Media Guidelines— the public's interest in Plaintiff speaking on those matters of public concern does not outweigh the significant governmental interests set forth above. In particular, we have recognized that a public safety official's interest in speaking on matters of public concern is sufficient to outweigh the compelling government interests set forth above when, for example, the official's speech is "grounded . . . in specialized knowledge [or] expresse[s] a general 'concern about the inability of the [Department] to carry out its vital public

25

mission effectively.'"[6] *Liverman*, 844 F.3d at 410 (third alteration in original) (quoting *Cromer v. Brown*, 88 F.3d 1315, 1325–26 (4th Cir. 1996)). For instance, in *Liverman*, we found statements by veteran police officers raising "[s]erious concerns regarding officer training and supervision" were sufficient to overcome the government's interest in preventing workplace disruption. *Id.* at 411; *see also Durham*, 737 F.3d at 302 ("Serious, to say nothing of corrupt, law enforcement misconduct is a substantial concern that must be met with a similarly substantial disruption in the calibration of the controlling balancing test."); *Goldstein*, 218 F.3d at 355 ("[T]he substance of the public concern included allegations that some emergency personnel lacked required training and certifications; that the leadership of the company was overlooking violations of safety regulations; and that the conduct of crewmembers was jeopardizing the safety of the crew and of the public. These allegations were a matter of the highest public concern, and as such, they were entitled to the highest level of First Amendment protection." (footnote omitted)). Plaintiff's Facebook activity is not of the same ilk as the speech at issue in *Liverman*, *Durham*, and *Goldstein*, which this Court found sufficient to outweigh the types of significant governmental interests at issue here.

In sum, we conclude the Department's interest in workplace efficiency and preventing disruption outweighed the public interest commentary contained in Plaintiff's

---

[6] By identifying speech grounded in a public employee's specialized knowledge or raising questions about public safety as *examples* of public employee speech warranting the highest level of First Amendment protection, we do not suggest that those are the *only* two categories of public employee speech warranting such protection.

26

Facebook activity.  In reaching this conclusion, we emphasize that this balancing test is a "particularized" inquiry.  *Goldstein*, 218 F.3d at 356.  Therefore, although we resolve the balancing test in favor of the Department, we expressly caution that a fire department's interest in maintaining efficiency will not always outweigh the interests of an employee in speaking on matters of public concern.  *See id.*

Because the Department's interest in managing its internal affairs outweighs the public interest in Plaintiff's speech, we need not reach the third prong of the *McVey* test.  As such, we conclude that the district court properly granted summary judgment in favor of Defendants on Plaintiff's First Amendment retaliation claim.

B.

Plaintiff also contends that the district court improperly dismissed his facial challenge to the Department's Social Media Guidelines and Code of Conduct as moot.  When a plaintiff challenges a government policy "for vagueness or overbreadth, the Supreme Court has concluded that [he] ha[s] standing to assert the rights of third parties whose protected speech may have been impermissibly curtailed by the challenged prohibition, even though as applied to the plaintiff[], the [policy] only curtailed unprotected expression."  *Brandywine, Inc. v. City of Richmond*, 359 F.3d 830, 835 (6th Cir. 2004) (citing *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 59 n.17 (1976)).  Because we find the district court properly granted Defendants' motion for summary judgment against Plaintiff, we decline to review Plaintiff's as-applied facial challenge and review only the district court's determination regarding Plaintiff's third-party facial challenge.

27

"We review the district court's mootness determination de novo." *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015). A claim becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (internal quotation marks omitted) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

On appeal, Defendants contend that the district court's mootness finding was proper because the Department has repealed the previous Social Media Guidelines and Code of Conduct in operation at the time of Plaintiff's termination; the revised policies did not include any of the provisions Plaintiff challenged in the prior iterations of the policies; and the Department "did not intend to readopt or enforce the challenged prior versions of either policy." Appellees' Br. at 17. Conversely, Plaintiff argues that the Department's subsequent actions have not mooted his facial challenge, as the Department is free to "re-enact the unconstitutional provisions of the old policies." Appellant's Br. at 36. We reject Plaintiff's contention.

"It is well established that a defendant's 'voluntary cessation of a challenged practice' moots an action only if 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000)). Here, in addition to adopting a new Social Media Policy and revised Code of Conduct, current Fire Chief Butler submitted a sworn affidavit that, "[a]s head of the Fire Department, [he] fully intend[s] to operate under the

28

newly issued [policies] and do[es] not intend to re-issue the original versions." J.A. 924. Additionally, Defendants' counsel declared at oral argument that the Department has no intent to reenact the offending policies. And from the record, we discern "no hint" that the Department has any intention of reinstituting the prior policies. *See Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1284–85 (11th Cir. 2004). Based on these formal assurances and the absence of any evidence to the contrary, Defendants have met their "heavy burden of persuad[ing]" this Court that they will not revert to the challenged policies. *Wall*, 741 F.3d at 497 (alteration in original) (internal quotation marks omitted) (quoting *Laidlaw*, 528 U.S. at 189); *see Winsness v. Yocom*, 433 F.3d 727, 736 (10th Cir. 2006) (finding that public officials' alteration of challenged policy, coupled with sworn affirmation that they would not revert to policy previously in effect, rendered plaintiff's challenge moot). Thus, the district court properly dismissed Plaintiff's third-party facial challenge as moot.

## III.

For these reasons, the judgment of the district court is

*AFFIRMED*.

29